**TASTY BAKING COMPANY and Tastykake, Inc.**

v.

**RALSTON PURINA, INC. and Continental Baking Co.**

Civ. A. No. 86–4961.

United States District Court, E.D. Pennsylvania.

Jan. 21, 1987.

S. Gordon Elkins, William G. Scarborough, Ursula B. Bartels, Philadelphia, Pa., for plaintiffs.

Henry Kolowrat, Richard C. Rizzo, Stephen A. Stack, Jr., Philadelphia, Pa., Dennis D. Fales, for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

This antitrust case, brought under § 16 of the Clayton Act, 15 U.S.C. § 26, to remedy violations of § 7 of the Clayton Act, 15 U.S.C. § 18, and § 2 of the Sherman Act, 15 U.S.C. § 2, concerns a purchase by one company of another company's assets. Plaintiffs assert divestiture is necessary to prevent defendants' monopolization of related wholesale and retail markets. Pending a plenary trial, plaintiffs seek a preliminary injunction directing defendants to manage their assets as if the purchased company and the purchaser company were independent, vigorously competitive entities. Defendants argue that these plaintiffs lack standing to obtain the requested equitable relief, and that the evidence does not justify it. I conclude that these plaintiffs have standing to obtain both divestiture and hold-separate orders, and that the present evidence justifies a preliminary injunction.

The parties do business as bakers. Plaintiffs are Tasty Baking Company and its wholly owned subsidiary, Tastykake, Inc., indistinguishable for present purposes, and hereinafter called Tasty. Defendants are Ralston Purina, Inc., hereinafter Ralston, and its wholly owned subsidiary, Continental Baking Company, hereinafter Continental. For several years the parties have baked competing products under the labels of Tastykake, by plaintiffs, and Hostess, by defendants.

Until early 1986, these products also competed with products labeled Drake, baked by a division of Borden, Inc. By the late spring of 1986, however, Borden considered defendants' offer to buy the Drake division. The companies filed pre-merger notices with the Federal Trade Commission and Antitrust Division of the Justice Department on May 30, 1986, these agencies expressed no objection, and the required waiting period expired June 29, 1986. The next day Borden agreed to sell certain assets and liabilities of the Drake division to defendants. Some details of that deal were kept secret, but the companies announced their agreement on July 1, 1986. On July 12, 1986, the transaction was fully consummated.

On August 21, 1986, upon receipt of plaintiffs' Complaint alleging illegalities in Continental's control of both Hostess and Drake product lines, I granted an *ex parte* order authorizing expedited discovery and scheduled a hearing on the preliminary injunction motion. After several postponements by agreement of the parties, the hearing began September 25, 1986, contin-

ued on the 29th and 30th, and concluded October 7, 1986. I heard oral argument November 6, 1986, and post-argument briefing was completed on January 15, 1987.

## I.

As a threshold matter, defendants assert that plaintiffs lack standing to prosecute this suit. I disagree.

## A.

■ Defendants' first argument derives from *Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) and *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Cargill,* the Supreme Court reiterated the view that to obtain injunctive relief under the Clayton Act § 16, "a private plaintiff must allege a threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' act unlawful.'" 107 S.Ct. at 491 (quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697).

In this case, plaintiffs have alleged antitrust injury. They claim that defendants' monopolization illegally will impair Tasty's ability to enter new markets and develop business, by facilitating Continental's negotiations with retailers for better store shelf space and promotional time slots in markets where Tasty does compete and by removing Continental's most substantial competitor in various markets and therein allowing Continental to reap monopoly profits that can subsidize predatory pricing in other markets. Complaint ¶¶ 29–30, 34; *see generally infra* IV.A (on plaintiffs' antitrust injuries). Defendants counter by characterizing Tasty's possible injuries as due to defendants' increased operating efficiencies and better service to customers. This creates a factual dispute, but does not demonstrate any inadequacy of plaintiffs' pleading.

## B.

■ Defendants' next argument derives from *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and, most generally, *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). These cases establish that, to collect treble damages under the Clayton Act § 4, plaintiffs must be injured directly by defendants' antitrust violations. This requirement, if applicable to claims for injunctive relief, would bar plaintiffs' claim under defendants' theory that Tasty supplies "independent driver/entrepreneurs" who are defendants' true competitors.

The factual premise of defendants' theory is far-fetched. In any event, as a matter of law, the requirement of direct injury does not apply to claims for injunctive relief. *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 590–94 (3d Cir.1979); *see Cargill,* 107 S.Ct. at 489–90 & nn. 5 & 6.

## C.

■ Defendants' last standing argument derives from *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 920–25 (9th Cir.1975), followed without elaboration in *Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050, 1060 (6th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 510, 511, 83 L.Ed.2d 401 (1984). In these cases, based on an analysis of the antitrust laws' legislative history, the courts held that no divestiture remedy may be obtained by plaintiffs challenging a competitor's acquisition of another competitor. That rule would bar plaintiffs' claims.

However, that rule has not found favor in this Circuit, and will not be applied here. Over a decade ago, in *NBO Industries Treadway Cos., Inc. v. Brunswick Corp.,* 523 F.2d 262, 278–79 (3d Cir.1975), *vacated on other grounds,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), Judge Gibbons

explained that, even if the statute's original drafters assumed that the Clayton Act § 16 did not create a private divestiture remedy,

> [i]t is quite another question whether legislative history from 1914, strong as it appears, should control the contemporary application of a statute laying down a fundamental national economic policy. This is especially true when the significance of the circumstances to which application is sought were perceived dimly, if at all, at the time of passage. The antitrust laws are of necessity statements of general principle. They must be given meaning in specific applications on a case-by-case basis. It is impossible for a legislature to devise codes so all-encompassing as to predict every case to which the general principle should apply. So, too, with antitrust remedies. There is a danger in permitting the pronouncements of statesmen long deceased to control the contemporary meaning of statutes which are almost an economic constitution for our complex national economy.

This language was not necessary to the disposition of *NBO Industries* because the court went on to find that, under the facts of that case, divestiture would not be appropriate. *Id.* at 279. However, based on the requirement of case-by-case application of the antitrust laws in above-quoted passage, Judge Troutman refused to preclude a plaintiff from seeking divestiture. *Joseph Ciccone & Sons, Inc. v. Eastern Industries, Inc.*, 537 F.Supp. 623, 630 (E.D. Pa.1982).

The correctness of Judge Gibbons' position was acknowledged in *Cia. Petrolera Caribe, Inc. v. ARCO Carribbean, Inc.*, 754 F.2d 404, 414 & 426–27 (1st Cir.1985). In that decision, Judge Bownes fully explained why competitor-plaintiffs deserve a divestiture remedy in appropriate cases. *Id.* at 413–30. Given the Supreme Court's recognition that "[s]ections 4 and 16 [of the Clayton Act] are ... best understood as providing complementary remedies for a single set of injuries," *Cargill*, 107 S.Ct. at 491, I find that competitor-plaintiffs, who would be entitled to seek treble damages, can seek the equitable relief of divestiture.

It is not surprising that one competitor should be accorded standing to challenge another competitor's acquisition that reduces competition in a shared market. *See Cargill*, 107 S.Ct. at 495, *approving on this point*, 761 F.2d 570, 577 (10th Cir. 1985) (collecting cases granting standing based on such allegations). While in some cases competing companies all may benefit by increasing oligopolistic character of a market, in other cases competitors—with specialized knowledge of their market— may recognize that an acquisition will enable the acquiring company to harm competition by harming the remaining competitors; with this special knowledge that enables rapid action, together with their access to resources needed to prosecute an antitrust action, competitor-plaintiffs well may assure that "a plaintiff adequately represents the interests of 'victims' of the antitrust violation" and that "in fashioning relief [judges] appropriately address and remedy the actual violation rather than simply correct an incidental injury." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210–11 (3d Cir. 1980). In all cases, of course, plaintiffs must prove that they face threatened antitrust injury, but evaluation of this proof is best separated from the standing analysis, and deferred for consideration as part of the merits of the case and as a factor determining the adequacy of plaintiffs' remedy at law. *Accord Monfort of Colorado, Inc. v. Cargill, Inc.*, 761 F.2d 570, 574 n. 2 (10th Cir.1985), *rev'd on other grounds*, —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

## II.

Notwithstanding the fact-sensitive nature of this case, at the preliminary injunction hearing the parties' strategies differed markedly. Plaintiffs presented five live witnesses and one witness by video deposition, submitted 105 trial exhibits and portions of ten depositions, and, in thorough briefs, explained how their evidence proved

defendants' violations of the antitrust laws. By contrast, although defendants did submit some evidence, they did not submit much; as conceded in Defendants' Post-Hearing Reply Memorandum, at 9, they "'haven't yet begun to fight' ... the antitrust merits of the case." The relative lack of defendants' factual submission cannot be excused by the preliminary nature of the proceedings—over a month elapsed between the lawsuit's initiation and the hearing, plaintiffs conducted all their discovery during this period, and defendants did not seek a postponement of the hearing. In all, the record includes plaintiffs' exhibits (PXs), defendants' exhibits (DXs), parts of individual depositions (Dep. s), the various briefs, trial testimony recorded in a consecutively paginated hearing transcript (Tr.), and a transcript of the oral argument (ATr.).

### III.

To obtain relief under the Clayton Act § 16, plaintiffs must prove a probability of success on the merits of their claims under the Clayton Act § 7 or the Sherman Act § 2. The Clayton Act § 7, designed "primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil," *U.S. v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957), broadly prohibits any acquisition with an effect that *"may be* substantially to lessen competition, or *to tend to* create a monopoly." *Brunswick*, 429 U.S. at 485, 97 S.Ct. at 695 (emphasis supplied in the quoted statute by the Supreme Court). The Sherman Act § 2, in addition to punishing actual monopolization, forbids attempts, as well as combinations or conspiracies, where defendants have a specific intent to obtain monopoly power, although monopoly power is not yet obtained. 16B *Business Organizations, von Kalinowski, Antitrust Laws and Trade Regulations* § 7.01[1], at 7–16 to 17. Both statutes focus attention on the facts to·define the relevant market, with the Clayton Act § 7 then focusing on facts to determine if the acquisition is proscribed because it creates

a "probable anticompetitive effect," *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), and with the Sherman Act § 2 then focusing on facts to determine if the acquisition effects a forbidden intentional plan to achieve monopoly power, *see U.S. v. Griffith*, 334 U.S. 100, 105–06, 68 S.Ct. 941, 944–45, 92 L.Ed. 1236 (1948).

### A.

■ Market definition is a central issue in this case. Count I of the Complaint raises claims under the Clayton Act § 7. "Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a[n acquisition] contravenes the Clayton Act." *U.S. v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974) (citations omitted).· Count II of the Complaint raises claims of actual and attempted monopolization under the Sherman Act § 2. Actual monopolization always requires proof of the relevant market, *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.E.d2d 778 (1966), and the same is required to prove plaintiffs' theory of attempted monopolization, *see American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.), *cert.· denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 & n. 17 (3d Cir.1975). For present purposes, a consolidated, fact-oriented market analysis is appropriate.

### 1.

■ The relevant product market is some sub-category of the snack food market. In their Complaint, ¶¶ 14–20, plaintiffs initially identified a market in snack cakes and pies. Later, plaintiffs argued that the relevant market is premium snack cakes and pies. Defendants apparently prefer not yet to address this issue directly, although they have suggested that the rele-

vant products may be sweet snacks, or even all snack foods. At oral argument, defendants' attorney conceded that defendants "haven't yet begun to fight on this aspect of the market...." ATr. 53. On the evidence presented, I find the following: .

Snack cakes and pies constitute a recognized market segment of the baking industry. This conclusion reflects testimony of plaintiff's employees, *e.g.*, Tr. 86 (Nagle, Tasty's director of national sales), of non-party witnesses called by plaintiffs, *e.g.*, Tr. 5 (Ratliff, Interstate Brands Corporation's executive vice-president, Dolly Madison Cake Division); Vance (American Bakeries Company, senior vice-president; formerly a vice-president of Continental) Dep. 8, and of one of the highest ranking employees transferred from Borden to Continental as part of the acquisition, *e.g.*, Christodoulou (Continental's vice-president and general manager, Drake Bakeries Division) Dep. 148–49. Most significantly, however, it reflects positions taken in documents prepared by Ralston, Continental, and Borden's Drake division before this litigation began. *E.g.*, PX 51, at 3 (Ralston's 1985 Annual Report to Shareholders states "Continental Baking is regarded as the leader in both bread and snack cakes."); PX 2, at 5 (Continental's 1986–88 Operating Plan includes "snack cakes" and "snack pies" as "markets"); PX 84, at 5 (1985 marketing plan, for Drake products, identifies a "U.S. market for Snack Cakes and Pies"). In this litigation, defendants appear to have adopted a different approach—they "tend not to define" a line of snack cakes and pies, but still they admit that "[m]any people in the industry [including defendants in the past], call [certain Hostess and Drake products] snack cakes and pies...." Pearce (Ralston's vice-president for consumer products business development) Dep. 66–68. Ultimately, however, defendants cannot deny the existence of a snack cake and pie market segment, a segment that, they recognize, generates between $1.0 and $1.4 billion in annual sales. *See, e.g.*, PX 2, at 2 ($1.0 billion); PX 16, at 3 (1986 Marketing Plan for Drake reports: $1.40 billion retail sales, $1.08 billion manufacturer's sales).

Snack cakes and pies include Tastykake Krimpets, Hostess Twinkies, and Drake Ring Dings. Generally, according to Tasty's attorneys, this market segment includes products that

are fresh, moist, baked (for cakes), baked or fried (for pies) products, generally no larger than approximately five ounces for a (one or more piece) serving, individually wrapped for use on a snack occasion or for the lunch pail or school bag, have a short shelf life, and in most cases are delivered directly to the retail stores, usually daily.

Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, at 31;[1] *see also* Tr. 123–25 (on cross-examination, Tasty's Nagle agrees that these products usually are sweet). This definition satisfies representatives of non-party companies in the baking business, witnesses called by plaintiffs. *See, e.g.*, Tr. 5–7 & 17 (Interstate's Ratliff and Schwab, executive vice-president for marketing); Vance Dep. 10–12. It also satisfies Drake's Christodoulou, Dep. 149–49, and is essentially accepted by Continental, PX 4, at 1 (1986–1988 Strategic Plan focuses attention on "high moisture content, short shelf life baked or fried products in which the most central quality issue is product freshness").

Thus defined, the snack cake and pie segment constitutes an "economically significant submarket" as defined in *Brown Shoe Co. v. U.S.*, 370 U.S. at 325, 82 S.Ct. at 1524. This must be deemed virtually admitted by defendants because, when considering a plan to take over Tasty, they examined both the Philadelphia and Northeast regional markets for the sale of snack cakes and pies, concluding that the post-acquisition market concentration would violate the antitrust laws. *See* PX 1 (dated

---

**1.** Plaintiffs use this language to define *premium* snack cakes and pies, but it captures the essence of their claims concerning all snack cakes and pies, except that lesser quality (non-premium) products have more preservatives and longer shelf lives than typical premium products.

August 27, 1985). Even without this evidence, however, I would find the snack cake and pie market deserving of antitrust protection under the multifactor *Brown Shoe* analysis. The rationale is best understood in response to defendants' alternative contentions about what the relevant product market might be.

First, they generally offer to prove that snack cakes and pies compete with other sweet goods. As support, defendants submit a summary of a study by the Marketing Corporation of America, which reaches the unremarkable conclusion that "Hostess heavy users appear to seek alternative indulgent sweet foods in the following market: ... Other easy sweet foods...." DX 44, at 1. They also submit the opinion of Pierce, Continental's director of sales of the eastern region for both bread and cake, that "snack cake and pies ... compete in the mind of the consumer with ... [f]resh baked shop type goods, cake donuts, candy bars, ice cream ... with all snacks [including cookies]." Dep. 115–16. All this suggests, at best, is that people who buy snack cakes and pies also sometimes buy other sweet snacks. It certainly does not prove that ice cream and snack cakes are substitutes and, more generally, it does not preclude a finding that snack cakes and pies constitute a relevant submarket within the market of all sweet snacks.

Second, defendants claim that the snack cake and pie market includes more products than plaintiffs believe, specifically, that it includes snacks like brownies, danish pastries, doughnuts, and cookies. Brown, Continental's chairman and chief executive officer, testified that snack cakes and pies include "honey buns" and also that he "would put in that category doughnuts that are in individual serving packets. [He doesn't] know if other people would." Dep. 54. Drake's Christodoulou, after some prompting by defendants' attorney, suggested that individual brownies in a family packet, individually served doughnuts and danish, and cookies are snack cakes and pies. Dep. 166–73. Interstate's Ratliff at one point opined that danish and donuts are snack cakes and pies. Tr. 15.

However, these statements seem aberrant, not consistent with the agreed-upon definition of snack cakes and pies, and unconvincing. At best, defendants' evidence tends to support a claim that, at the fringes, snack cakes and pies compete with other snack foods. *See also* Tr. 132–37 (Tasty's Nagle explains that soft cookies compete at the fringes of the snack food market).

Defendants' own documents provide the best reasons not to expansively define the relevant submarket to include cookies, danish, and brownies, in particular, or sweet snacks, in general. In one, dated May 12, 1986, and labeled "FY 1986/87 Hostess Marketing Plans," defendants examine "Sweet Snack Foods Sales Trends," define sweet snacks to include "candy, cookies, yogurt, ice cream, and frozen desserts, etc.," and break out the two distinct submarkets in which Hostess competes—"cake donuts" and "snack cakes and snack pies," PX 5, at 1; *see also, e.g.,* PX 2, at 2 & 5 (identifying a snack cake and pie market separate from a cake doughnut market). Continental's Chairman Brown, in a December 17, 1985 memorandum to Ralston's Chairman Stiritz, points out that cookies, crackers, and direct store-distributed snack foods are not in any product category within defendants' wholesale baking industry. PX 64; *see also* Christodoulou Dep. 172 (Drake commissioned a study of the snack cake and pie market excluding doughnuts and cookies); Vance Dep. 18 (when at Continental, he did not treat snack cakes and pies as in the same market as cookies). This evidence confirms plaintiffs' claims, also supported by their own employees' testimony, that bakers treat the snack cake and pie segment as economically significant.

This is further confirmed, without reciting plaintiffs' employees' testimony, by evidence of bakers' pricing practices. *See, e.g.,* Pierce Dep. 21–22 (Continental now prices its Hostess pies against "what other people are selling their individually wrapped pies for," and generally recognizes that Hostess directly competes in the

market for "individually wrapped snack cakes and pies"); Vance Dep. 17–18 (Continental previously priced Hostess against Drake and Tastykake products, not against cookies); PX 38 (post-acquisition, Drake products are priced by comparison to Hostess and Tastykake products); Tr. 7–10 (Ratliff affirms that Interstate's Dolly Madison snack cakes and pies are priced against other companies' snack cakes and pies, not against cookies and not against breakfast cakes). Further, by an internal document Continental has recognized that "snack cake and pie [as distinguished from breakfast-oriented baked goods] media efforts [should] be combined for synergy and efficient use of funds," PX 5, at 4, and, when trying to persuade retailers to carry its products, Drake's market share in snack cakes and pies is advertised, e.g., PX 79; see Christodoulou Dep. 138–41. Finally, in addition to its pricing and marketing practices based on a snack cake and pie market, Continental has recognized that its "distribution structure," suited to snack cakes and pies, "is not designed to compete cost effectively in longer shelf-life product categories such as cookies, crackers, or lower quality cakes." PX 4, at 1.

Tasty's Nagle testified, without contradiction, that retailers treat snack cakes and pies as a market: these products are displayed together in high turnover areas of stores (to facilitate impulse buying), not mixed with other products that defendants purport to locate in the same market; these products are advertised in a coordinated way, so that in no week will a retailer promote two lines of snack cakes and pies, while it might well promote doughnuts or cookies of one company in the same advertisement as snack cakes and pies from another. Tr. 96–98. Other bakers' employees confirmed that consumers distinguish snack cakes and pies from breakfast and other dessert items, e.g., Tr. 5, 9–11 (Ratliff), from cookies, e.g., Tr. 17–18 & 27–28 (Schwab); Vance Dep. 60–61, and from doughnuts, in particular, e.g., Vance Dep. 14, 19–20; see also PX 61 (Continental distinguishes doughnuts from snack cakes).

The foregoing illustrates the variety of arguments, each essentially uncontradicted by defendants, that support finding plaintiffs likely to prove that snack cakes and pies are the relevant product market. I so find.

I also note plaintiffs' claim that the relevant product market is *premium* snack cakes and pies. They thereby would exclude from consideration products marketed under the Little Debbie label. These products are, according to all witnesses, lower in quality and lower in price than are, for example, Tastykake, Hostess, and Drake products. This does not necessarily exclude Little Debbie products from the market under scrutiny, however, and I am not yet convinced that a market for premium snack cakes and pies can be distinguished.

2.

■ The relevant geographic market issue also engenders dispute. Plaintiffs contend that the acquisition's effect should be measured by its impact in certain urban areas—including Boston, New York, Philadelphia, and Washington, D.C.—and in certain regions—including the New England and mid-Atlantic states. Defendants label plaintiffs' proposed markets "gerrymandered," suggest that some broader geographic area should be considered, but fail to specify any definition of what boundaries to adopt. On the evidence presented, I find the following:

These cities and regions are large enough, in terms of snack cake and pie sales, to be areas of concern under the antitrust laws. *See von Kalinowski, supra*, § 8.02[2][b], at 8–31 nn. 47 & 48 (collecting cases finding markets in single municipalities, under the Sherman Act § 2); *id.*, § 18.03[2][b], at 18–101 n. 22 (same, under the Clayton Act § 7). These areas will experience the most substantial impacts of the acquisition, because previously these cities and regions encompassed the primary areas of competition between Drake and Hostess products. *Compare* PX 72 (Drake sells products across New England, most of New York, New Jersey,

eastern Pennsylvania, Delaware, Maryland, Washington, D.C., northeastern Virginia, and south and central Florida) *and also infra* III.B.1 (identifying Drake's share of sales in these cities and regions) *with, e.g.,* PX 2 & 4 (Hostess generally sells products across the country, leaving only a few areas of non-distribution not relevant here) *and also infra* III.B.1 (identifying Hostess' share of sales in these cities and regions).

The key question is whether, as a matter of practical "commercial realities," these urban and regional boundaries circumscribe areas of "effective competition" between bakers of snack cakes and pies. *Brown Shoe*, 370 U.S. at 320 n. 35, 82 S.Ct. at 1521 n. 35 (Clayton Act § 7); *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311 (3d Cir.1982) (Sherman Act § 2). Areas "of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

The sellers' operations and purchasers' opportunities depend on a multi-step distribution system for snack cakes and pies. After baking, the product is brought to centralized distribution centers, called depots. From there, the goods are loaded onto trucks for local delivery. On fixed routes, the trucks make pre-arranged stops at retail stores. The stores place the snacks on racks until sale or until so much time passes that the product is no longer fresh. The unsold items are exchanged for fresh-baked goods, and the bakers attempt to unload the "stales" at reduced prices in their thrift stores. This system links the wholesale and retail markets for snack cakes and pies.

Therein, three important transactions involve sales—consumers buying from retailers, retailers buying from bakers, and bakers' sales through thrift stores—and each of these is affected by local consumer preferences, bakers' marketing strategies (including advertising), and negotiated whole-sale prices for snack cakes and pies. Continental's Pierce, Dep. 41–42, explained that consumer preferences differ in the different urban and regional markets identified by plaintiffs because, for whatever reason, one or another baker established a substantial market presence before other bakers. *See also* Christodoulou Dep. 106 (explaining that urban and rural consumers differ in significant ways that shape competition in the Washington, D.C. area). Substantial documentary and testimonial evidence confirms that bakers generally design marketing strategies recognizing distinct urban and regional markets, including plaintiffs' targeted areas. *See, e.g.,* Pierce Dep. 39–42; PX 4; Vance Dep. 22–24; Christodoulou Dep. 99–111; PX 16. In particular, bakers' pricing policies reflect awareness of localized competitive conditions in the areas plaintiffs identify. *See, e.g.,* PX 38 (Hostess products); PX 12 (Drake products, post-acquisition); Tr. 11–12 (Interstate's Dolly Madison products). This evidence, coupled with the testimony of plaintiffs' employees, supports the claim that, in practice, effective competition takes place within the named urban and regional markets.

Further support for this conclusion follows from examination of three distribution transactions—bakers' decisions to establish depots and routes, negotiations for distribution services to carry goods between depots and retailers, and bakers' placement of bakeries. Bakers establish the numbers of depots and routes, as well as the route structure, based in large part on local considerations. *See, e.g.,* Tr. 72 (Bracken, Continental's executive vice-president for operations overseeing Drake, identifies synergies available by consolidation of routes and depots when one firm sells more than one product in a locality); Tr. 73 (Bracken acknowledges a situation in Florida where Tastykake and Drake products are carried by a single distributor because, before the acquisition, neither competitor could generate enough business to go it alone). The distribution of goods at depots and between depots and retailers is labor-intensive, and therefore localized employment

conditions shape bakers' competition. *See, e.g.,* PX 2, at 3. Although plaintiffs concede defendants' point that bakers can ship their products great distances between bakeries and depots, ATr. 22, competitive advantages clearly accrue to bakers with bakeries relatively nearer to any given market, *see, e.g.,* PX 2, at 3, PX 10, at 2; Tr. 101, 127 & 174–75. This evidence also supports plaintiffs' proposed relevant geographic markets.

There is more. For example, when Continental considered acquiring Tasty, it specifically studied the post-acquisition concentration of the Philadelphia market, PX 1; *see also* PX 61 (defendants acknowledge Tasty's leadership in the Philadelphia snack cake market); *cf.* PX 64 (identifying other takeover targets for Ralston's chairman, Continental's chairman focuses attention on isolated urban and regional markets for baked goods, including snack cakes and pies). Similarly, Ratliff affirms that Interstate generally perceives markets defined by metropolitan areas. Tr. 11. In response, defendants cite no other evidence and make no argument that use of plaintiffs' proposed geographic markets would work an injustice. Accordingly, I find plaintiffs likely to prove that each of the following is a relevant geographic market: Boston, New York, Philadelphia, Washington, D.C., New England, and the mid-Atlantic region.

### B.

As defined by product and geographic characteristics, the relevant markets provide the settings within which to assess the significance of defendants' acquisition. The distribution of shares in each market provides the primary basis for determining if defendants violated the Clayton Act § 7, *Brown Shoe,* 370 U.S. at 322 n. 38, 82 S.Ct. at 1522 n. 38, can demonstrate that defendants possess monopoly power required to prove monopolization illegal under the Sherman Act § 2, *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04, and bears on the question whether a "dangerous probability of success" makes an attempted monopolization illegal under the Sherman Act § 2, *von Kalinowski, supra,* § 9.01[2][a], at 9–9 & n. 25. Other market characteristics also influence the determination of defendants' liability under each of plaintiffs' theories, insofar as these characteristics clarify the probable anticompetitive effect of the acquisition. *See von Kalinowski, supra,* § 19.02, at 19–29 (Clayton Act § 7); *id.,* § 8.02[3], at 8–36 (Sherman Act § 2, monopolization); *id.,* § 9.01[2], at 9–12 (Sherman Act § 2, attempted monopolization). For all plaintiffs' claims, a consolidated factual analysis is appropriate to provide a basis for resolving these legal issues of market power.

#### 1.

Information about market shares comes both from non-party companies that do business measuring market shares and from witnesses' testimony. Plaintiffs presented the following summary of data from three companies: A.C. Neilsen Co. (Neilsen) (52–week average dollar shares of the markets); Mediamark Research, Inc. (MRI) (104–week average shares of unit sales to all homemakers in the markets); and National Family Opinion, Inc. (NFO) (best estimated figure, BE; most conservative estimate. C). PX 22.

MARKET SHARE SUMMARY

| Market | Share (in %) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Drake + Hostess | Drake | Hostess | Tastykake | Little Debbie | Dolly Madison | Other |
| **Boston** | | | | | | | |
| Neilsen | 77.0 | 47.7 | 29.3 | 0.2 | 8.9 | — | 13.9 |
| MRI | 67.0 | 40.1 | 26.9 | 0.0 | 23.9 | 1.8 | 7.1 |
| **New York** | | | | | | | |
| Neilsen | 72.5 | 54.5 | 18.0 | 16.6 | 1.6 | — | 9.4 |
| MRI | 71.0 | 44.2 | 26.8 | 16.8 | 4.8 | 3.7 | 3.8 |

| Market | Share (in %) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Drake + Hostess | Drake | Hostess | Tastykake | Little Debbie | Dolly Madison | Other |
| **Philadelphia** | | | | | | | |
| Neilsen | 25.6 | 18.5 | 7.1 | 64.7 | 4.1 | 0.3 | 5.3 |
| MRI | 18.1 | 8.3 | 9.8 | 70.7 | 5.8 | 0.5 | 5.0 |
| **Washington, D.C.** | | | | | | | |
| MRI | 39.2 | 2.7 | 36.5 | 17.5 | 33.4 | 6.8 | 3.2 |
| **New England** | | | | | | | |
| MRI | 59.2 | 23.8 | 35.4 | 4.6 | 23.0 | 4.7 | 8.4 |
| NFO (BE) | 78.4 | 34.7 | 43.7 | 3.5 | 16.0 | 2.2 | — |
| NFO (C) | 47.5 | 21.0 | 26.5 | 2.1 | 9.7 | 1.3 | 39.4 |
| **Mid-Atlantic** | | | | | | | |
| Neilsen | 49.0 | 36.5 | 12.5 | 40.7 | 2.8 | — | 7.5 |
| MRI | 40.5 | 17.1 | 23.4 | 36.3 | 13.0 | 5.2 | 5.1 |
| NFO (BE) | 54.0 | 20.8 | 33.2 | 26.2 | 13.4 | 6.3 | — |
| NFO (C) | 34.0 | 13.1 | 20.9 | 16.5 | 8.4 | 4.0 | 37.1 |
| **National** | | | | | | | |
| MRI | 37.8 | 4.9 | 32.9 | 8.8 | 34.9 | 8.5 | 9.9 |

No market share data from defendants contradict plaintiffs' evidence. In fact, at least until the acquisition, Drake's Christodoulou and Sherman, vice-president for marketing, relied on Neilsen's data for planning. *See, e.g.,* Christodoulou Dep. 111–16 & 132; Sherman Dep. 79–81 & 86–87; PX 77. Moreover, plaintiffs' evidence from the independent companies is consistent with market estimates from Continental's Pierce, Dep. 39–40, and Tasty's Nagle, Tr. 90–91. Accordingly, I conclude that the data from Neilsen, MRI, and NFO provide a reasonable basis for evaluating the present state of the relevant markets.

Of course, the present state of a market does not necessarily determine its future development if other companies may enter as new competitors. In the snack cake and pie business, however, companies generally experience substantial barriers to entry into new geographic areas, as is recognized by Continental and Drake employees. *See, e.g.,* Pierce Dep. 28, 41–42 & 107–09; Csenge (Drake vice-president for sales) Dep. 90–91. These barriers reflect the high costs to build bakeries, to develop brand recognition, and to establish routes with favorable retailer participation. *See,*

*e.g.,* Pierce Dep. 28; Csenge Dep. 71–73; Vance Dep. 34–42; Tr. 106–10 (Tasty's Nagle); *see also* PX 4, at 5 (Continental recognizes that it participates "in a mature, capital intensive business ... with declining volumes and high fixed costs"); PX 10, at 2 (Borden perceived the difficulty of expanding into new areas as a reason for selling the Drake division). As a result, Interstate's Ratliff agreed with plaintiffs that no significant companies have begun baking snack cakes and pies over the past five years and that none are likely to enter the relevant markets in the foreseeable future, Tr. 12; Drake's Csenge, also agreeing that no new bakers have entered the relevant product market for five years, Dep. 90, acknowledged a declining number of independent snack cake and pie bakers, Dep. 57. Finally, the evidence of defendants' acquisition strategy, discussed below, tends to show that defendants expect continued difficulty entering new markets and developing existing markets.

Meanwhile, even before acquiring Drake, Continental established itself as the nation's leading baker of snack cakes and pies. *See, e.g.,* PX 51, at 3; PX 55; PX 22; *see also* PX 2, at 2 (Continental claims a

40%–share of the national market for snack cakes and pies); Tr. 33–34 (Bracken notes that Hostess products are available to 80% of American households). Defendants' continuing market power is reinforced by access to Ralston's financial resources. Based on their knowledge of the industry, Interstate's Ratliff and Schwab testified that even if all bakers (or a monopolist) supplying a relevant urban or regional market were to raise prices 5%, no new competitors would enter the market. Tr. 12–13 & 22; *accord* Vance Dep. 34; Tr. 105–06 (Nagle). Defendants presented no significant evidence that existing producers will enter these relevant markets as new competitors within the foreseeable future, so I find plaintiffs likely to prove that the existing market shares provide a meaningful basis on which to evaluate the future significance of the acquisition.

2.

■ Several Supreme Court decisions establish guidelines for determining violations of the Clayton Act § 7. In *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963), the Court held that

> a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in concentration of firms in that market, is so inherently likely to lessen competition that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

In that case, the Court established that a resulting 30% market share triggered the presumption. *Id.* at 364, 83 S.Ct. at 1742; *see also, e.g., U.S. v. Mrs. Smith's Pie Co.*, 440 F.Supp. 220, 231 (E.D.Pa.1976) (divestiture ordered when a company with a 26–28% market share bought a company with a 7% market share). In *U.S. v. Continental Can Co.*, 378 U.S. 441, 461, 84 S.Ct. 1738, 1749, 12 L.Ed.2d 953 (1964), the Court suggested that a resulting 25% market share triggers the presumption. Also, in *U.S. v. Aluminum Co. of America*, 377 U.S. 271, 280, 84 S.Ct. 1283, 1389, 12

L.Ed.2d 314 (1964), the Court recognized that within a highly concentrated market, a market leader's acquisition of a company with only 1.3% of the market can be barred by the Clayton Act § 7. *See also, e.g., Federal Trade Comm'n v. PepsiCo., Inc.*, 477 F.2d 24, 27–28 (2d Cir.1973) (acquisition of 1% market share holder can be forbidden). Under these precedents, Continental's acquisition of the Drake division presumptively violates the Clayton Act § 7 in the Boston, New York, and Washington, D.C. urban markets, in the New England and mid-Atlantic regional markets, and even (if the MRI study proves representative) in the national market for snack cakes and pies.

Such presumptions are not, of course, irrebuttable. *U.S. v. General Dynamics Corp.*, 415 U.S. 486, 494–504, 94 S.Ct. 1186, 1192–1197, 39 L.Ed.2d 530 (1974). They could be overcome by evidence "that the market-share statistics g[i]ve an inaccurate account of the acquisition['s] probable effects on competition." *U.S. v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975). However, the burden of proof would be on defendants. *Id.; U.S. v. Marine Bancorporation*, 418 U.S. at 602, 94 S.Ct. at 2856. Defendants offered no significant evidence on this point and, as noted, plaintiffs offered evidence of market structure tending to confirm the significance of the market share statistics. See also *U.S. v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 555, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170 (1971), where the Court recognized that "concentration of 75% of ... business in one firm points firmly to the conclusion that the difficulties of new entrants becoming competitors ... are greatly increased." Thus, as a matter of fact, defendants totally fail to rebut the presumption of antitrust violations established by plaintiffs.

Application of the Herfindahl-Hirschman Index, employed by the U.S. Department of Justice in the agency's Merger Guidelines, *reprinted in von Kalinowski, supra* (Appendix 4), and acknowledged by defendants to be an important tool for assessing acqui-

sitions, *see* PX 1; *accord Federal Trade Comm'n v. PPG Industries, Inc.,* 798 F.2d 1500, 1503 (D.C.Cir.1986), supports the conclusion that defendants' acquisition creates an impermissible increased concentration in the relevant markets in this case. The Index is calculated by summing the squares of each firm's share (expressed as a percentage) of a given market. If the post-acquisition sum exceeds 1800, the market is deemed highly concentrated and if, due to the acquisition the Index increases over 100 points, "only in extraordinary cases will [other] factors [cause the Justice Department to believe that the acquisition] is not likely substantially to lessen competition." § 3.11(c).

Based on plaintiffs' evidence of market shares, the Index of market concentration before and after the acquisition is as follows:

### HERFINDAHL–HIRSCHMAN INDEX

| Market | Index before Acquisition | Index after Acquisition | Difference |
|---|---|---|---|
| **Boston** | | | |
| Neilsen | 3213 | 6008 | 2795 |
| MRI | 2906 | 5063 | 2157 |
| **New York** | | | |
| Neilsen | 3572 | 5534 | 1962 |
| MRI | 2991 | 5360 | 2369 |
| **Philadelphia** | | | |
| Neilsen | 4596 | 4858 | 262 |
| MRI | 5197 | 5360 | 163 |
| **Washington, D.C.** | | | |
| MRI | 2808 | 3005 | 197 |
| **New England** | | | |
| MRI | 2392 | 4077 | 1685 |
| NFO (BE) | 3387 | 6420 | 3033 |
| **Mid-Atlantic** | | | |
| Neilsen | 3153 | 4065 | 912 |
| MRI | 2354 | 3154 | 800 |
| NFO (BE) | 2441 | 3822 | 1381 |
| **National** | | | |
| MRI | 2474 | 2797 | 323 |

Given that defendants offer no evidence to suggest that these results do not reflect the acquisition's anticompetitive impact, in all relevant markets, using any of the measures of share distribution, the Index reveals that the acquisition increases market concentration to an extent forbidden by the Clayton Act § 7. *See Federal Trade Comm'n v. PPG Industries,* 798 F.2d at 1503; *see also von Kalinowski, supra,* § 19.02[2][b], at 19–50 to 57 (collecting Supreme Court cases tying findings of antitrust violations to increases in concentration in a market).

Nothing else need be shown to demonstrate that defendants' acquisition impermissibly creates a probable anticompetitive effect. Therefore, I find plaintiffs likely to prove that defendants violated the Clayton Act § 7.

### 3.

With respect to the claim of actual monopolization under the Sherman Act § 2,

analysis also begins with assessment of market shares. In *U.S. v. Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704, the Court explained that

> The existence of [monopoly] power may be inferred from the predominant share of the market. In *American Tobacco Co. v. United States*, 328 U.S. 781, 797 [66 S.Ct. 1125, 1133, 90 L.Ed. 1575], we said that "over two-thirds of the entire domestic field of cigarettes, and ... over 80% of the field of comparable cigarettes" constituted "a substantial monopoly." In *United States v. Aluminum Co. of America*, 148 F.2d 416, 429 [2nd Cir.1945], 90% of the market constituted monopoly power. In the present case, 87% of the accredited central station service business leaves no doubt that the congeries of these defendant have monopoly power....

See also *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), where the court ruled that a 65% market share can provide a basis for inferring monopoly power. On the other hand, as Judge Wyzanski has explained, where a company "has not over 50% of the share of the market, ... [it] has not such market power as to furnish a basis for a conclusion that it has monopolized the field." *U.S. v. United Shoe Machine Corp.*, 110 F.Supp. 295, 346 (D.Mass.1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); *accord Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984); *see also Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania*, 745 F.2d 248, 261 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985) (32–35% market share is "insufficient as a matter of law to establish monopolization....."). Between the extremes, "the relative effect of percentage command of a market varies with the setting in which that factor is placed." *U.S. v. Columbia Steel Co.*, 334 U.S. 495, 528, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948).

■ Because defendants control less than half of the business in Philadelphia, Washington, D.C., the mid-Atlantic region, and the nation, I conclude that plaintiffs are unlikely to prevail on their claim of actual monopolization in these relevant markets. By contrast, in the Boston and New York urban areas, plaintiffs' evidence shows that Drake and Hostess products together constitute over 70% of the market, which justifies a presumption of actual monopolization; in the New England region, defendants appear to control 60–75% of the business, enough to justify further analysis of that market. *See also United Shoe Machinery Corp.*, 110 F.Supp. at 343, *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (75–plus percentage market share, given other factors, constitutes monopoly power); *U.S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 166–75, 68 S.Ct. 915, 933–38, 92 L.Ed. 1260 (1948) (70% can suffice).

The facts discussed above that show the validity of using present market shares to trigger Clayton Act § 7 presumptions also help determine whether defendants' large share of the business in Boston, New York, and New England conveys monopoly power in those markets. There are relatively few, and a declining number of, bakers of snack cakes and pies. In these markets, at most one baker provides defendants with possibly meaningful competition (by holding a 5% or greater market share), and if Little Debbie turns out not to compete in the same market as Hostess and Drake products, *see supra*, then in some markets defendants face no substantial competitors. The snack cake and pie markets face relatively static, possibly declining demand, and, from a technological perspective, have operated in a relatively constant manner over time. Market entry is difficult. These market features tend to reinforce plaintiffs' contention that defendants possess monopoly power in Boston, New York, and New England. *See von Kalinowski, supra*, § 8.02[3][c][i], at 8–42 to 45.

Indeed, there is evidence that Continental possessed substantial market power even before acquiring Drake. Alone among snack cake and pie bakers in the relevant

markets, Continental refused to share space on its racks with competitors; other competitors negotiated rack-sharing agreements among themselves. *See, e.g.,* PX 52; Tr. 116–17 (Nagle); *cf.* Tr. 73 (in Florida, Bracken acknowledges, Tasty and Borden negotiated for one company to distribute Tastykake and Drake product lines simultaneously, a practice that Continental will stop if possible); *see also* Tr. 84–85 & 111 (Nagle's description). Such evidence is relevant notwithstanding that "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 2856, 86 L.Ed.2d 467 (1985).

The most recent evidence of defendants' monopoly power is found in defendants' post-acquisition pricing decisions. Over initial objections by Drake's Christodoulou, shortly after the acquisition, Continental officials orchestrated an across-the-board increase in prices for Hostess and Drake products. Christodoulou Dep. 62–66; Tr. 56–57 (Bracken). The price increase took effect September 22, 1986. Tr. 35 (Bracken); PX 12; PX 23. No cost increase justified this price increase. Waydo (Borden's president of the snacks and international consumer products division and executive vice-president) Dep. 104–06; Tr. 102 (Nagle); *see also, e.g.,* PX 2 at 6 (Continental expected material costs to fall 7% during 1986; labor costs were expected to increase 4%); PX 65 (Pearce recognizes that Continental's cake prices are high by comparison to the competition in 1985); *but see* PX 23 (Continental claims, without support, that cost increases justified the price rise). About six weeks later, in Philadelphia and Baltimore, to meet competition from Tastykake, Continental rolled back prices of Drake products and planned a rollback for Hostess products. ATr. 16–18; 51; *cf. also* PX 38 (after the acquisition, Drake officials anticipated that a price increase could not be sustained in markets where Tastykakes were established). This shows that defendants actually have exercised monopoly power in Boston, New York, and New England,

where prices were not rolled back, and such behavior is powerful evidence of actual monopolization. *See, e.g., American Tobacco Co. v. U.S.,* 328 U.S. 781, 804–06, 66 S.Ct. 1125, 1136–37, 90 L.Ed. 1575 (1946); *Addyston Pipe and Steel Co. v. U.S.,* 175 U.S. 211, 237–38, 20 S.Ct. 96, 106, 44 L.Ed. 136 (1899).

■ Defendants offer no significant evidence of limits on their market power. Plaintiffs' evidence of defendants' market shares, coupled with evidence of market structure and defendants' business practices, convinces me that plaintiffs are likely to prove that, in Boston, New York, and New England, defendants possess the requisite monopoly power.

4.

■ To prove attempted monopolization under the Sherman Act § 2, plaintiffs must show a "dangerous probability" that defendants could establish a monopoly. *See Lorain Journal Co. v. U.S.,* 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951) (quoting *Swift & Co. v. U.S.,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905)); *see also American Tobacco Co. v. U.S.,* 328 U.S. at 785, 66 S.Ct. at 1127 (jury charge approved). This showing requires proof of at least one overt act to distinguish an attempt from mere preparation, *Swift & Co.,* 196 U.S. at 402, 25 S.Ct. at 281, which is easily found in Continental's purchase of Drake, and also an assessment of defendants' market power, *American Bearing Co.,* 729 F.2d at 949, *see Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965).

■ Market power for this purpose depends on the same factors—market share and market structure—that determine market power needed for actual monopolization. *See U.S. v. Columbia Steel Co.,* 334 U.S. at 527, 68 S.Ct. at 1124; *see also, e.g., Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., Inc.,* 783 F.2d 159, 162 (10th Cir.1986) (considering market shares, number and strength of competitors, ease of

entry, consumer price sensitivity, market innovations, and whether defendant is a multimarket firm); *National Reporting Co. v. Alderson Reporting Co.,* 763 F.2d 1020, 1025 (8th Cir.1985) (considering presence of new competitors and government bidding requirements); *Domed Stadium Hotel,* 732 F.2d at 490 (calling for consideration of market share, market concentration, entry barriers, consumer demand, competition's strength, and consolidation trends). However, the level of market power required to support a finding of attempted monopolization is, in general, less than the level of market power required to support a finding of actual monopolization. *See Domed Stadium Hotel,* 732 F.2d at 490–91 (collecting cases allowing a finding of attempted monopolization where defendants held 24–50% market shares); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579, 598 (7th Cir.1971) (Stevens, J.), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972) (one-third market share sufficed to find attempted monopolization); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 316 (3d Cir.1983), *rev'd on other grounds,* —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (44.2% to 49.2% market shares could constitute market power supporting a finding of attempted monopolization); *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384, 404 & 406 (D.Del.1978) (35% market share could satisfy the dangerous probability standard). Moreover, the level of market power required to support a claim of attempted monopolization depends on the type of conduct constituting the attempt. *See U.S. v. American Airlines,* 743 F.2d 1114, 1118 (5th Cir.1984), *cert. dismissed,* —— U.S. ——, 106 S.Ct. 420, 88 L.Ed.2d 370 *consent judgment entered,* 1985–2 Trade Cas. (CCH) ¶ 66,866 (N.D.Tex.1985) [Available on WESTLAW, DCTU database]; *P. Areeda & D. Turner,* 3 *Antitrust Law* ¶¶ 834–36 (1978); *H. Hovenkamp, Economics and Federal Antitrust Law* 169–70 (1985).

In this case, plaintiffs complain that defendants plan to buy up most significant companies that bake snack cakes and pies for sales in the relevant urban and regional markets. The evidence comes almost entirely from defendants themselves.

On August 27, 1985, Continental's Chairman Brown received a report concerning the desirability of buying Tasty. PX 1. The cover memorandum reveals both that defendants analyzed Tasty's financial prospects and that the analyst investigated whether antitrust laws barred the acquisition. He concluded both that the financials were "not particularly attractive" and that antitrust laws "probably" would bar the acquisition, using relevant market of either Philadelphia or the entire Northeast. In response, Brown penned a note on the cover memorandum, stating: "Thanks. Does not look like an acquisition opportunity."

Brown met in September with Ralston's Vice-President Pearce to discuss, among other topics, "acquisition needs." PX 65. Pearce's file memorandum of September 9, 1985, records that the two men considered acquiring the Little Debbie product line manufactured by McKee Baking Company. *Id.* This same possibility was considered in a September 25, 1985, meeting between Pearce and a Continental employee, O'Connor, involved with purchasing. *Id.*

Based on these meetings and other investigations, Pearce drafted a document titled "Continental Baking Company Strategy Review." Dep. 16. On October 16, 1985, he sent this document with a cover memo to Continental's Chairman Brown. PX 69. The purpose of the Strategy Review, expressed at page 1, included recommending "an acquisition strategy/program for [Continental]." PX 69. The authors of the Strategy Review concluded, at page 5, that Continental's "snack cakes are relatively highly priced and face increased competition from low priced snack cakes and a wide range of new snack products," and, at page 9, that Continental's "current snack cake business needs to be protected through the acquisition and/or internal development of a line that can compete in the lower end of the segment." As a bottom line, in the cover memorandum Pearce, for Ralston, recommended "that acquisition

not be a key component of the strategy except as a possible defensive maneuver on snack cakes," and that "a meeting [be set up] to discuss the report and schedule next steps."

One or more such meetings were scheduled, including Pearce, Brown, and others from Continental. Pearce Dep. 16. Pearce came away with no doubt that Continental wanted to pursue an acquisition policy. *Id.* 17. On December 17, 1985, Continental's Chairman Brown wrote Ralston's Chairman Stiritz to "outline our initial thinking about [Continental's] acquisition strategy" and attached a list of possible companies to acquire. PX 64. This list included McKee Baking Company, but not the Drake division of Borden.

Some time in February or March, Continental's Brown received word that Borden wished to sell Drake. Brown Dep. 23. Brown brought in Pearce and he, together with various Continental employees, investigated the desirability of the purchase and what changes would be made if the Drake division was sold. *See, e.g., id.* 23–25, 27–31 & 33–38. The deal closed rapidly, the transfer of ownership becoming effective July 12, 1986. PX 41. *Compare* Stiritz Dep. 14–15 (Ralston took over a year to negotiate its purchase of Continental).

Meanwhile, negotiations for Little Debbie proceeded apace. On July 2, 1986, in preparation for a July 30, 1986 meeting between Ralston's chairman Stiritz and McKee family representatives, Brown asked Pearce and another employee to estimate how valuable the McKee company would be to Ralston. PX 58. On July 18, 1986, Pearce sent Brown a draft memorandum discussing why the transaction should be completed, and soon; it was revised and sent to Stiritz on July 25, 1986. PX 48. Although that deal has not gone through, Brown has expressed continuing interest in McKee, Dep. 99–102, stating that "six months or a year from now I might call Jack McKee and just see what their current situation is, and if they might have any more interest ... than what they have currently," *id.* 99–100.

Throughout this period, Pearce considered the possibility of acquiring snack cake and pie bakers including American Bakeries and Campbell-Taggert. Dep. 23. According to a Continental employee's memorandum, "American Bakeries Co. is the fifth largest baking company," and Continental has done extensive planning concerning a possible purchase. PX 60. Defendants have purchased part of American's business, trademarks in St. Louis, Brown Dep. 42–43, and Brown remains interested in buying—he has "made a couple of contacts, and they have not said 'absolutely no,' but on the other hand, they have not said 'yes, we are really interested in this;'" he feels if he "was going to bring up the subject again with American, that it would be better to do so after this injunction hearing," *id.* 52. A purchase of Campbell-Taggert would remove one potential competitor because, according to Continental's 1986–88 Operating Plan, "Campbell-Taggert is the second largest baking company in the U.S., largest except for [Continental], ... owned by Anheuser-Busch, Inc, ... [with] a line of snack cakes which it has been attempting to build in recent years." PX 2, at 3. Similarly, Chairmen Stiritz and Brown have considered acquiring Entenmans, a company Brown recognized to provide extremely high-quality baked goods, with Brown concluding that if the "opportunity ... arises, there is good rationale to pursue it at least on an exploratory basis." PX 63; *see also* Christodoulou Dep. 165–67 (noting that Entenman's presently provides little competition in snack cake and pie markets). Finally, without going into details, I note that Continental has considered numerous possible acquisitions to augment its bread business. *See, e.g.,* PX 64; Pearce Dep. 23–24.

This evidence documents a continuing and comprehensive corporate acquisition strategy. The plan has led defendants to buy one of their major competitors, to make (and contemplate making future) offers for another, and to consider taking over three companies that, although presently less significant bakers of snack cakes

and pies, provide much of defendants' potential competition. If the target companies and defendants negotiate mutually agreeable terms, it is undenied that defendants possess resources sufficient to complete all the proposed transactions.

In these circumstances, the question is not whether defendants are likely to monopolize a relevant market—that would require impossible divination—but, rather, whether the possibility of monopolization is to be deemed dangerous based on policy considerations. *See Kearney & Trecker Corp.*, 452 F.2d at 598. Broad application of attempt laws may discourage procompetitive behavior while narrow application may encourage nascent anticompetitive activity to flourish; either result could cause irremediable harm. *See H. Hovenkamp, supra*, § 6.4 at 166–67. To minimize such harms, a context-dependent analysis of attempt claims should impose a threshold requirement of market power that is relatively less either when defendants are demonstrably less likely to have any legitimate justification for their actions or when defendants' action alone is relatively more likely to cause antitrust injury. *Cf., e.g., P. Areeda & D. Turner, supra* ¶ 835c, at 350 (market shares of 30–50% normally do not suffice for proof of an attempt to monopolize except for (a) conduct that is highly likely to create a monopoly or (b) conduct that is so invidious that it is almost always unjustified).

In an acquisition situation, two extreme cases may be discerned. In a relatively unconcentrated market, with a relatively low market share, a company may seek increased economies of scale without seriously threatening monopolization by a takeover attempt. In contrast, "[i]f a defendant offers to purchase all other firms in [a] market, the transaction can clearly be enjoined, with no need to estimate [the defendant's] current market position." *Id.* at ¶ 835a, at 346; *cf. U.S. v. American Airlines, supra* (unaccepted solicitation to fix prices can constitute attempted monopolization, discussed below). The scenario of an all-encompassing offer closely resembles the present case.

In the relevant urban and regional markets (excluding Philadelphia), all highly concentrated and protected by substantial entry barriers, defendants increased their market share from between 20 and 40% to between 60 and 75% in Boston, New York, and New England, and to between 35 and 50% in Washington, D.C. and the mid-Atlantic region. Defendants would be hard-pressed to argue (and have not submitted evidence) that the Drake or other proposed acquisitions could create significant pro-competitive efficiencies of production or distribution in the markets; moreover, also taking into account Continental's share of the national market and Ralston's size, the risk that defendants could leverage their present position into a monopoly is relatively great in these markets. *See also infra* IV.B (discussing plaintiffs' threatened antitrust injuries). In general, "[w]hen a market is highly concentrated and has a dominant firm with substantial market power, then the cost of overdeterrence [of procompetitive behavior by an injunction based on antitrust laws] is relatively low, while the cost of underdeterrence [of anticompetitive behavior by refusing a requested injunction] is high." *H. Hovenkamp, supra*, § 6.4, at 167. The present circumstances make sanctions for takeovers particularly appropriate.

This case resembles *U.S. v. American Airlines, supra.* There, Robert L. Crandall, President at American Airlines, asked the president of a competitor to join in a price-fixing scheme. 743 F.2d at 1116. This could violate the Sherman Act § 2 under the court's holding "that a highly verbal crime such as attempted monopolization may be established by proof of solicitation along with the requisite intent." *Id.* at 1121. The dangerous probability of success requirement was satisfied by allegations that the individuals involved in the deal had authority to effect the plan, that if Crandall's proposal was accepted the participating companies would have controlled between 60 and 90% of the relevant market, *see id.* at 1115–16, and that substantial

barriers restricted the entry of new competition. *Id.* at 1119.

 Here, as in *U.S. v. American Airlines*, top corporate executives personally entered acquisition negotiations. Also, as in *American Airlines*, defendants started out with substantial market shares and would, if all proposed deals go through, possess 70–90% of all relevant markets excluding Philadelphia (but including the national market if MRI's data is representative). Significantly, in this case defendants' plan does not require any illegal action by the targeted companies, making their cooperation more likely than the illegal cooperation requested by Crandall. Thus, compared to defendants in *U.S. v. American Airlines*, defendants here possess as much or more ability to complete their plan.

I find plaintiffs likely to prove a dangerous probability that defendants, given their market power, will monopolize the markets in both Washington, D.C. and the mid-Atlantic region; also, that if defendants could be found not to possess monopoly power sufficient for a finding of actual monopolization of the Boston, New York, and New England markets, in each of these markets defendants' market power creates a dangerous probability of monopolization. Moreover, even without the evidence of defendants' other, incomplete takeover plans, because defendants have articulated no legitimate purpose for greatly enhancing their share of concentrated markets by acquisition of the Drake division whose major business was done in markets where Continental was well-established, I would conclude that plaintiffs are likely to prove a dangerous probability that defendants will monopolize these five markets.

### C.

 The evidence of monopoly power in certain markets and a dangerous probability of monopolization in other markets must be coupled with proof that defendants inappropriately intended to achieve the forbidden results, if plaintiffs are to prevail on their Sherman Act claims.

A general intent to create or maintain an actual monopoly violates § 2, "for no monopolist monopolizes unconscious of what he is doing," but attempted monopolization cannot be established without proof of a specific intent to destroy competition or build monopoly. *Times-Picayune Publishing Co. v. U.S.,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953) (quoting *U.S. v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir.1945) (L. Hand, J.)). With respect to defendants' actual monpolization of the snack cake and pie markets in Boston, New York, and New England, the requisite general intent to monopolize is easily inferred from defendants' acquisition of a competitor in violation of the Clayton Act § 7, and is confirmed by the evidence of defendants' developed acquisition strategy. Indeed, this evidence might suffice to infer a specific intent to attempt monopolization. Such a specific intent is, in any event, likely to be established by plaintiffs based on the preceding and following evidence.

Preliminarily, I note plaintiffs' claim to have uncovered a proverbial "smoking gun." In a file memorandum recording an orientation session with Continental's Chairman Brown, Ralston's Pearce wrote that acquisitions were needed to "[t]ake competition out." PX 65. In another file memorandum, recording an orientation session with a Continental employee in purchasing, Pearce more explicitly stated that the "[b]read strategy is to take competition out and then increase price." *Id.* See also PX 55, where Pearce wrote Brown that one advantage of buying McKee is the "[a]bility to control pricing in a basically non-competitive atmosphere." I find that the statements accurately summarize goals agreed to by the participants in each orientation.

In an attempt to explain how I might avoid drawing an adverse inference from this evidence, at oral argument defendants' attorney characterized Pearce as an "eager beaver." ATr. 50 & 86. Perhaps this is so, but Pearce's clear language leads me to conclude that Continental's officials counted substantial reductions in competition as

among the primary benefits of their acquisition program.

The most telling evidence of an illegal specific intent comes not from any discovered documents, however, but from the non-discovery of any documents wherein defendants considered the antitrust consequences of the Drake deal. Clearly defendants knew that the acquisition would implicate antitrust concerns: when evaluating Tasty for possible acquisition, Continental analyzed the deal under antitrust standards, PX 1; similarly, Continental considered the antitrust consequences of acquiring the Little Debbie product line from McKee, PX 55; and defendants knew of their obligation to seek pre-acquisition antitrust clearance from the Justice Department and Federal Trade Commission. Moreover, defendants and Borden expressly discussed "the possibility that an antitrust suit by someone would be filed to prevent the [Drake] acquisition." Waydo Dep. 149. Borden feared such a suit because it could be forced to retain the Drake division in a damaged condition, so it initiated these discussions with defendants' representatives Pearce, Jim Carpenter, Continental's general counsel, and defendants' tax counsel. *Id.* at 150. In this context, defendants' failure to produce any documents demonstrating a realistic antitrust analysis of the Drake deal convinces me that either defendants found the antitrust problems so manifest as to render formal analysis unnecessary, or defendants did such an analysis and so feared its release that they destroyed the records. In either case, the decision to consummate the Drake deal demonstrates a specific intent to monopolize.

There is more. Inferences adverse to defendants may be drawn from Brown's pre-acquisition consideration of how defendants could raise Drake's prices after acquisition. *See, e.g.,* Dep. 66; PX 68; *cf. id.* 102 (defendants probably would raise Little Debbie prices if defendants acquired McKee); Pearce Dep. 68 (same). Other adverse inferences follow from Pearce's statement to Ralston's Chairman Stiritz, a statement approved by Continental's Chairman Brown, that a premium price could be paid for the McKee company because "the present government position on merger activity offers a current opportunity that may not exist in the future." PX 48. In sum, I find plaintiffs likely to prove that defendants specifically intended to monopolize all the relevant urban and regional markets.

Therefore, in addition to the likelihood that defendants violated the Clayton Act § 7, I find a likelihood that defendants illegally monopolized the Boston, New York, and New England markets and that defendants illegally attempted monopolization of the Washington, D.C. and mid-Atlantic markets. Even if defendants turn out to lack monopoly power necessary for actual monopolization, I find a likelihood that defendants illegally attempted monopolization of the Boston, New York, and New England markets.

### IV.

Proof of a probable antitrust violation does not, by itself, establish a probability that plaintiffs ultimately will obtain divestiture under the Clayton Act § 16. The statute generally authorizes relief "under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...." 15 U.S.C. § 26. This language makes clear that not actual, but only threatened loss or damage need be shown. *Cargill,* 107 S.Ct. at 489. The loss or damage must, however, constitute antitrust injury, *see supra* I.A, and threatened harms must be shown clearly. *But see Cargill,* 107 S.Ct. at 498 (Stevens, J., dissenting).

### A.

Plaintiffs complain that defendants, for so long as they coordinate management of Hostess and Drake product lines, will exercise ill-gotten market power to undermine plaintiffs' ability to compete in all relevant markets. In areas where plaintiffs have no presence but wish to

begin selling, such as parts of New York State, *see, e.g.,* Tr. 109–10, and in areas where plaintiffs have gained a toehold and wish to expand, such as New England generally and Boston particularly, *see, e.g.,* Tr. 91–92, plaintiffs' business development—difficult enough given the above-discussed market characteristics—would be made unfairly costly, or impossible, by the actions described below. In plaintiffs' more established markets, primarily Philadelphia and the mid-Atlantic region, plaintiffs' profits would be reduced unfairly, and Tasty's viability endangered, by the same actions. The actions include both pricing and non-pricing practices.

Plaintiffs first recall Continental's documented ability and inclination to set different prices in different local markets for snack cakes and pies. In any market where Tasty (or another competitor) poses a competitive threat deemed significant, defendants can reduce retail prices (by reducing wholesale prices), distribute promotional coupons, or otherwise make Hostess and Drake products available at prices below the prices that would be established in a fairly competitive market. This creates antitrust injury if defendants' pricing is predatory. *Cargill,* 107 S.Ct. at 493.

"Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Id.* Although the Supreme Court has not determined precisely what is "an appropriate measure of cost," *id.* n. 12, under this definition, given the impermissible intent, defendants probably would be predatorily pricing if a promotion reduced the effective price of a snack cake and pie more than 3–4% below the competitive price level, 3–4% being the approximate profit margin in the snack cake and pie industry, Tr. 13 (Ratliff); *cf.* PX 2, at 8 (Continental plans to be the industry pricing leader for 1986–88, pricing snack cakes 1% above costs or less if needed "to meet competitive situations"); it would certainly constitute predatory pricing if, given the impermissible intent, defendants distributed coupons for free snack cakes and pies, set two-for-one deals, or even gave out 10 cents off coupons because of the low retail prices for snack cakes and pies. These are some of the anticompetitive activities envisioned by plaintiffs.

Plaintiffs also describe how their entry into, expansion within, and preservation of share in relevant markets could be frustrated by defendants' use of non-price strategies. For example, numerous witnesses noted that certain retail outlets refuse to carry more than three (sometimes four) lines of snack cakes and pies. *E.g.,* Christodoulou Dep. 85–88; Vance Dep. 21–22; Tr. 10–11 (Ratliff); Tr. 21 (Schwab); Tr. 99–100 (Nagle). If defendants successfully pressure retailers to carry both Hostess and Drake products where previously the retailers carried only one of these lines, then Tasty suffers lost access to retail outlets. Further, snack cake and pie bakers compete for more and better location of shelf space because, in the words of Continental's Pierce, for this "impulse type item, ... the key to selling is exposure to the consumer." Dep. 96; *see* PX 5, at 4; Tr. 99 (Nagle). Similarly, bakers compete to receive choice times for promotions by retailers, who will promote only one line of snack cakes and pieces in a given week. *See, e.g.,* Christodoulou Dep. 83–85; Tr. 96–99 (Nagle). If defendants successfully pressure retailers to allot Tasty less favorable selling space and promotional times than were allotted previously, Tasty's sales per store will decline. Obviously, any good competitor would like to tie up retail outlets, prime shelf space, and optimal promotion times, but plaintiffs here argue that the Drake acquisition—conveying a new product line and substantial market share—enables defendants to obtain a disproportionate advantage by illegal predation.

Defendants' activities must be found to be illegally predatory if the behavior constitutes an attempt " 'to exclude rivals on some basis other than efficiency.' " *Aspen Skiing Co.,* 105 S.Ct. at 2859 (quoting *R.*

*Bork, The Antitrust Paradox,* 138 (1978)). Increased efficiency sufficient to justify significant changes in retail product positioning is unlikely to be found, because before the acquisition Hostess' and Drake's substantial individual market shares—over 20% in all relevant urban and regional markets outside Philadelphia (except for Drake in Washington, D.C.)—probably enabled the bakers to obtain all fair economies of scale. Instead, any exclusion of Tastykakes from desirable shelf space and promotion times, with concomitant impairment of consumers' freedom to obtain their favorite product, probably would be attributable mostly to the market power obtained through defendants' illegal acquisition. *See Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., Inc.,* 753 F.2d 1354, 1357 (6th Cir.), *cert. denied,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *U.S. v. Ingersoll-Rand Co.,* 320 F.2d 509, 524 (3d Cir.1963); *see also Aspen Skiing Co.,* 105 S.Ct. at 2860 n. 38 ("it is not irrelevant to note that similar conduct carried out by the concerted action of ... independent rivals with a similar share of the market would constitute a *per se* violation of § 1 of the Sherman Act"). Thus, in any store where, by reason of defendants' coordinated control over both Hostess and Drake product lines, Tastykakes receive less favorable treatment, plaintiffs suffer antitrust injury.

▇ Defendants concede that below-cost pricing is actionable, given predatory intent, but argue that no sanctions can be imposed based on aggressive attempts to secure favorable treatment by retailers, because such activities are pro-competitive. Perhaps this would be true if defendants had acquired their market power legally. However, defendants fail to acknowledge that presumptively legitimate actions against competitors can take on evil character, and become illegal, in circumstances demonstrating predatory intent. *See Aspen Skiing Co.,* 105 S.Ct. at 2856; *see also Cargill,* 107 S.Ct. at 493 n. 12 (leaving open the possibility that "above-cost pricing coupled with predatory intent [could be] sufficient to state a claim of predation"). All

the predatory intent needed in this case is demonstrated by defendants' specific intent to monopolize (and by the Clayton Act § 7 presumptions in Boston, New York, and New England), so these identified components of plaintiffs' anticipated loss or damage, if realized, would constitute antitrust injury.

### B.

▇ Unmanifested antitrust injuries create a cause of action under the Clayton Act § 16 only if the loss or damage is threatened. This requirement was interpreted in *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n,* 274 U.S. 37, 54, 47 S.Ct. 522, 527, 71 L.Ed. 916 (1927), with the Court explaining: "An intent to restrain interstate commerce being shown, it is enough to justify equitable interposition by injunction if there be a dangerous probability that ... injury will happen...." Under a more recent formulation in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." This requirement is satisfied where defendants manifest an intent to violate the antitrust laws, as here, by evidence that the identified anticompetitive actions are feasible and would significantly benefit defendants.

Plaintiffs' claim of "threatened injury from predatory pricing must, of course, be evaluated with care." *Cargill,* 107 S.Ct. at 495 n. 17. In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1357–58, 89 L.Ed.2d 538 (1986), the Court opined "that predatory pricing schemes are rarely tried, and even more rarely successful." However, "there is ample evidence that the practice does occur." *Cargill,* 107 S.Ct. at 484 & n. 16. Accordingly, I evaluate the practicability and promise of predatory pricing.

Defendants in this case are much better positioned to engage in predatory pricing than were defendants in either *Cargill, supra*, or *Matsushita, supra*. Defendants operate a single integrated company (so they need not rely on a continuing conspiracy), with large market shares to begin with, possess capacity to absorb business from competitors leaving the market—*see, e.g.*, Tr. 39–40 (defendants plan to shut down at least one of Drake's bakeries for now); Signore Dep. 37 (same), and operate in markets where high entry barriers would persist and increase as substantial competitors are undermined.

■ Further, given the localized nature of the product markets, predatory pricing can be targeted to any area where Tasty seeks to increase business or to areas where Tasty is strong. In those areas where defendants possess a monopoly or near monopoly, predatory pricing would be primarily a defensive maneuver and, given the other entry barriers, probably would not need to continue for a long time to succeed. In those areas where defendants possess sub-monopoly power, predatory pricing would be more of an offensive maneuver and might take longer to yield benefits; the interim losses, however, could be subsidized both by the resources of Ralston and by the "war chest"—plaintiffs' evidence suggests it totals well over $10 million annually, *see infra*—that would be created by defendants' ability to charge monopolistic prices in Boston, New York, and New England. Based on this evidence, I find plaintiffs likely to prove that predatory pricing is feasible for defendants.

The advantage derived from monopoly may be appreciated by examining markets where, after the merger, defendants successfully implemented a price increase without increased costs. From Drake's 1986 Marketing Plan, PX 16, at 6, it is fair to estimate Drake's annual sales at over $60 million in New York and over $20 million in Boston. From the evidence of market shares, for this purpose only, it is fair to estimate Drake's market share in New York at 60% and in Boston at 50%. This

conservative analysis yields a total New York market of $100 million and total Boston market of $40 million. From the evidence of market shares, for this purpose only, it is fair to estimate defendants' market share in New York at 70% and in Boston at 65%. This would give defendants $70 million in New York business and $26 million from Boston, yielding $96 million in total annual sales based on pre-acquisition prices. After the acquisition, defendants raised prices about 12%, Tr. 112 (Nagle), creating over $10 million in monopoly profits. Such potential revenues create a powerful incentive to establish and maintain monopolies in all the relevant markets.

Defendants offer no significant evidence identifying particular difficulties they would face in conducting a predatory pricing scheme. They do argue that no rational profit-maximizing seller would engage in predatory pricing, a proposition that is doubtful at best and would not be conclusive because few (if any) sellers are always rational profit-maximizers. Indeed, plaintiffs have submitted evidence that Continental employed a predatory price-based "blocking strategy" to undermine Tasty's program to enter the Philadelphia doughnut market. *See* PX 61; *see also* Tr. 119–20 (Nagle) (describing how the blocking strategy affected Tasty). In sum, I find plaintiffs likely to prove that they face threatened predatory pricing. *Cf. McCaw Personal Communications, Inc. v. Pacific Telesis Group*, 645 F.Supp. 1166, 1170 (N.D.Cal.1986) (predatory pricing allegations not being "so improbable as to be inconsistent with economic reality," plaintiffs demonstrated a threat of antitrust injury).

■ Plaintiffs are even more likely to suffer the injury of disadvantageous treatment by retailers. Defendants could not (nor do they even suggest they should) avoid leveraging their full market power for maximum benefit. In areas where defendants dominate the business, this certainly will cause retailers to treat minor competitors, including Tasty, less favorably. *See, e.g.*, Tr. 99 (Nagle). Indeed, it

may be unnecessary for defendants even to ask for favorable treatment, for "sophisticated businessmen are quick to see the advantages in securing the good will of the possessor [of substantial market power]." *U.S. v. Ingersoll-Rand*, 320 F.2d at 524. In areas where defendants have lesser market power, they still will be able to leverage the illegal acquisition to obtain disproportionately favorable treatment by retailers. Their treatment will be made all the better due to retail chains' interest in maintaining defendants' good will within the monopolized Boston, New York, and New England markets, and even nationwide where defendants enjoy an approximately 40% share of the business. Benefits for defendants from such a program are difficult to calculate, but given the ease of leveraging the illegally acquired power, I find plaintiffs likely to prove that they face threatened predatory non-pricing actions.

### C.

■ The parties' dispute also must be subjected to the commandment in equity actions to consider the public interest. For the antitrust context, in *Zenith Radio Corp.*, 395 U.S. at 130–31, 89 S.Ct. at 1580, the Supreme Court has explained that

> the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws. *E.g., United States v. Borden Co.*, 347 U.S. 514, 518 [74 S.Ct. 703, 706, 98 L.Ed. 903] (1954). Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 [64 S.Ct. 587, 592, 88 L.Ed. 754] (1944). Its availability should be "conditioned by the necessities of the public interest which Congress has sought to protect." *Id.*, at 330 [64 S.Ct. at 592].

The public has good reason to fear the consequences of defendants' acquisition. The immense increase in defendants' share and the concentration in the relevant markets, coupled with the evidence of defendants' recent price increases—unjustified by cost pressures and thus probably monopolistic—would certainly entitle consumer plaintiffs to equitable relief. *See also* Tr. 24–26 (Interstate's Schwab expects more price increases). Indeed, it is likely that if these competitor-plaintiffs were found to lack antitrust injury then some class action would be brought by consumers.

With respect to both the public's and plaintiffs' identified harms, only the requested relief of divestiture ultimately could provide adequate protection. *See NBO Industries*, 523 F.2d at 279. If plaintiffs prevail on their claim, as I have found likely, defendants will have no equitable basis for complaining of harm they may suffer—they inflicted it themselves. In sum, I find plaintiffs likely to prevail on their claim for divestiture.

### V.

■ This probability of ultimate success on the merits does not by itself justify entry of a hold-separate order. Such preliminary injunctive relief must be based on traditional equitable principles, including a "showing that the danger of irreparable loss or damage is immediate...." 15 U.S.C. § 26.

The analysis is not difficult. Based on the evidence, I find both a strong probability that plaintiffs will prevail and a compelling public interest in minimizing defendants' ability to extract monopoly profits. And even if defendants should ultimately prevail, there is no reason (and defendants make no argument) that the bond required by 15 U.S.C. § 26 would not adequately reimburse them for any harm suffered under a hold-separate order. The only debatable issue is whether plaintiffs will suffer irreparable harm between now and the conclusion of a plenary hearing. I find that plaintiffs have made a sufficient showing on this point, for two independent reasons.

First, plaintiffs will be irreparably harmed by any of defendants' possible predatory practices during the next few months, because any lost business cannot be reestablished easily and money damages cannot be calculated readily. This threatened loss or damage almost certainly will occur before a completed plenary hearing. In the relevant markets, any price reduction by defendants could be predatory and any demand for better shelf space or promotion times could be an illegal exercise of ill-gotten market power. These issues, if litigated, would consume excessive court and attorney time; any attempt to monitor all markets for such violations would cause great expenditures of time, energy, and money. Precisely because of the difficulties in supervising and evaluating markets, Americans rely heavily on the preservation of competition. Competition, to the extent it existed before defendants' acquisition, fairly will be assured by a hold-separate order.

Second, there is the issue of what happens to the Drake business while this action is pending. Plaintiffs presented evidence that, absent a hold-separate order, pending a hearing on the merits defendants will bleed Drake of substantial assets and restructure Drake so that it could not easily survive on its own after divestiture. I find this evidence credible, especially that relating to the displacement of management and operations personnel, *see, e.g.,* Bracken Affidavit; Signore Dep. 39–40, 44–45 & 49, merging of Hostess and Drake routes, *see, e.g.,* Bracken Affidavit; Tr. 46–48 & 71–72, *see also* Brown Dep. 25 (Continental has considered merging all Drake production into Hostess plants); Tr. 69–70 (Bracken notes that Continental has considered merging Hostess and Drake stores), joint promotion and distribution of Drake and other Continental products (including Wonder Bread, for example), *see e.g.,* Csenge Dep. 31–33; Tr. 45 & 72, and defendants' assumption of Drake administrative functions including data processing, pricing and sales policy-making, labor relations, purchasing, and advertising, *see, e.g.,* Tr. 34–38 & 58; Signore Dep. 37. This evidence, if nothing else, shows how much about Drake would be learned by defendants during the next few months, giving defendants an unfair advantage after divestiture.

In rebuttal, defendants make self-serving statements about how the consolidated management could only strengthen Drake. These are unpersuasive, especially given defendants' plans to pare Drake down to the level of a single bakery like other Continental bakeries, not a separate corporate division. *See* Brown Dep. 33–34. No corporation can be trusted to handle the affairs of a competitor. I conclude that, absent a hold-separate order, the viability of a divested Drake organization would be difficult to assure. *See also* Tr. 54–55 (Bracken concedes that defendants' plans for Drake do not take into account the need to facilitate divestiture).

Any diminution in Drake's post-divestiture competitive power clearly will harm consumers irreparably and, plaintiffs claim and I agree, will harm Tasty irreparably. Simply put, Tasty is better positioned to compete with Hostess in some markets if Hostess faces strong competition (keeping prices fair) in others. A contrary conclusion would leave defendants free to swallow up a competitor, to digest it in part, and, upon a court order, to regurgitate insubstantial remains. No such result is acceptable.

For similar reasons, I reject defendants' argument that laches bars plaintiffs' request for a preliminary injunction. All evidence suggests that defendants took special steps to reduce the risk of a pre-consummation lawsuit to restrain the acquisition, that plaintiffs filed a timely complaint and motion for preliminary relief, and that plaintiffs developed the evidence without improper delay.

Bearing all the foregoing in mind, the parties will be given 15 days to submit proposed remedial orders and appropriate supporting memoranda. An Order follows.

## ORDER

AND NOW, this 21st day of January, 1987, it is ORDERED that defendants' mo-

tion for summary judgment is DENIED and FURTHER ORDERED that, within fifteen (15) days, the parties shall submit proposed hold-separate orders (with appropriate explanatory memoranda, if desired), in conformity with the views expressed in the accompanying Opinion.