UNITED STATES of America, Plaintiff,

v.

CALMAR INCORPORATED and Realex Corporation, Defendants.

Civ. A. No. 84–5271.

United States District Court, D. New Jersey.

Jan. 31, 1985.

W. Hunt Dumont, U.S. Atty., Newark, N.J. by Seymour H. Dussman, Frank Seales, Jr., Richard S. Nicholson, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., Wilentz, Goldman & Spitzer, Woodbridge, N.J., and Weil, Gotshal & Manges by Richard S. Taffet, Alan J. Weinschel, New York City, for defendant Calmar Inc.

Shanley & Fisher by Arthur Schmauder, Morristown, N.J., and Gage & Tucker, Kansas City, Mo., for defendant Realex Corp.

DEBEVOISE, District Judge.

This is an action which the United States instituted under Section 15 of the Clayton Act, 15 U.S.C. Section 25, as amended, seeking to enjoin the merger of defendants Calmar Incorporated and Realex Corporation. The government charges that the effect of implementation of an August 6, 1984 merger agreement between the defendants would be substantially to lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act 15 U.S.C. Section 18, as amended. The government sought a preliminary injunction, and an evidentiary hearing was held from January 21—January 25, 1985. This opinion constitutes my findings of fact and conclusions of law.

## I. *The Complaint*

The complaint defines two relevant product markets, each of which is subject of this action.

**1300**

The first market consists of "regular sprayers." The complaint defines a regular sprayer as "a plastic pump with a spray head that, when fully depressed, dispenses approximately one cubic centimeter of liquid from a container in the form of dense, 'wet' spray of large particles."

The second market consists of "regular dispensers." The complaint defines a regular dispenser as "a plastic pump with a spout that, when fully depressed, dispenses a steady stream of approximately one to two cubic centimeters of viscous liquid from a container."

Further, the complaint alleges, and defendants do not deny, that the United States is the relevant geographic market in which both regular sprayers and regular dispensers are sold.

The complaint purports to measure the effects of the proposed merger by application of the Herfindahl-Hirschman Index (the "HHI"). The HHI measures market concentration by squaring the market share of each firm competing in the market and then summarizing the resulting numbers.

There are, according to the complaint, three domestic manufacturers of regular sprayers including Calmar with 60 percent of the market and Realex with 23 percent of the market. The HHI is now approximately 4,400. Calmar's acquisition of Realex would increase the HHI by more than 2,700 to more than 7100.

There are, according to the complaint, five domestic manufacturers of regular dispensers including Calmar with 58 percent of the market and Realex with 21 percent of the market. The HHI for the market is now approximately 4,000. Calmar's acquisition of Realex would increase the HHI by more than 2,400 to more than 6400.

The complaint charges that this dramatic increase in the HHI in each of the product markets defined in the complaint reflects the actual anticompetitive effect in the marketplace which would result from the merger, for example, the elimination of competition between Calmar and Realex, increased concentration in already highly concentrated markets and a substantial lessening of competition in the two markets.

## II. The Applicable Legal Principles

 To obtain a preliminary injunction a party must demonstrate (i) a reasonable likelihood of eventual success on the merits and (ii) the probability of irreparable injury if the relief is not granted. The Court must also consider the consequences which the decision would have upon other persons and it must consider the overall public interest. *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148 (3d Cir.1984). In an action brought by the United States to enforce Section 7 of the Clayton Act irreparable injury is presumed once the government has established a reasonable likelihood of success on the merits. *United States v. Ingersoll-Rand Co.*, 320 F.2d 509 (3d Cir. 1963).

The substantive law which governs the determination whether the government has demonstrated a reasonable likelihood of eventual success on the merits is readily stated, though it is frequently less readily applied.

Section 7 of the Clayton Act, 15 U.S.C. Section 18, prohibits acquisitions that may substantially lessen competition in any line of commerce in any section of the United States. The determination of whether a particular acquisition, such as Calmar's acquisition of Realex, may have the prohibited effect requires first that the line of commerce or product market in which competition might be effected be defined. Next it is necessary to define the area of the country or geographic market in which any anticompetitive effect of the merger would be felt. Having defined the relevant product in geographic markets, the structure of the market must be examined to determine the share of competitors and the degree of concentration and to evaluate all the market factors which could affect competition in the market. *Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc.*, 414 F.2d 506 (3d Cir.1969)

*cert. denied,* 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970).

In the present case the parties agree that the relevant geographical market is the entire United States. Therefore, the market inquiry is addressed only to the appropriate product market, an issue on which the parties disagree profoundly.

To define the bounds of the product market it is necessary to determine what products are reasonably interchangeable with the product in question, that is to say, products to which consumers would switch if there were a small but significant non-transitory price increase. *Brown Shoe Company v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *SmithKline Corporation v. Eli Lilly and Co.,* 575 F.2d 1056 (3d Cir.) *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

Many factors have to be taken into account in measuring the so-called "cross-elasticity of demand," for example, industry or consumer recognition of the products as a market, the peculiar uses and characteristics of the products, the kinds of production facilities, sensitivity to price change, specialized users and vendors.

While supply alternatives might better be considered in connection with the case of entry evaluation which is mentioned below, it may be appropriate in determining the product market to identify alternative suppliers. That is to say, firms which can easily and quickly switch their current production to the product in question. *Allis-Chalmers Manufacturing Co. v. White Consolidated Industrial, Inc., supra.*

■ If the definition of the product and geographic market shows a high degree of concentration resulting from a merger, a prima facie case of illegality has been established. *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). In that case the Court concluded that a merger resulting in a single firm controlling 30 percent of a market where the four-firm concentration ratio exceeded 70 percent was presumptively illegal. United States Department of Justice 1984 merger guidelines employ the Herfindahl-Hirschman Index to measure market concentration. The guidelines characterize a market as unconcentrated if the HHI is below 1,000, moderately concentrated if the HHI is between 1,000 and 1800, and highly concentrated if the HHI is above 1800. Here, of course, according to the government, the HHI in the regular sprayer market will be 7100 after the merger and the HHI in the regular dispenser market will be 6400 after the merger.

■ If a merger does not result in an impermissible degree of market concentration, no further inquiry is required. However, if a merger does result in a high degree of concentration, it still may be shown that the merger will not result in a substantial lessening of competition because factors at work in the market will make it unlikely that the remaining producers in the market will be able to exercise market control. An example of such a factor is ease of entry, a condition which defendants urge exists in this case. If ease of entry in the market is such that the producers in the market could not long sustain an unjustified price increase, then in spite of a high degree of concentration there has not been a substantial lessening of competition. *United States v. Waste Management, Inc.,* 743 F.2d 976 (2d Cir. 1984).

### III. *The Industry and Products*

Calmar, a publicly held corporation, has a plant in Ohio and a plant in California at which it manufactures a wide variety of plastic dispensing devices—devices through or by which products are removed from their containers for use. The products include pump dispensers (which deliver lotions, liquids and viscous creams), pump sprayers (which deliver liquid in the form of a fine spray or a mist), trigger sprayers (which deliver liquids in the form of a mist, spray or stream through the use of a trigger type device), and closures (which in-

**1302**

clude a wide variety of caps and tops for bottles and other containers).

Realex operates a manufacturing plant in Missouri. It manufactures a variety of pump dispensers and pump sprayers. Another division of Realex not pertinent to this case manufactures various household products.

The pertinent products manufactured by Calmar and Realex consist primarily of injection molded plastic parts, along with some other parts such as springs and balls. These parts are assembled into finished products either by hand or by using machinery. The products contain from 6 to 13 parts.

The products to which the parties have referred in this case and which must be considered in determining the relevant market are the following, the figures being in most instances 1984 figures:

1. *Regular Dispensers:* These are mechanical pump devices which fit on the top of containers. They dispense liquid or viscous material in the container by use of the finger pressing on a pumping means.

The market for this product as shown on G–24 is 140 million units of which 75 million units were used for liquid soap, 45 million units were used for hand and body lotion, two million units were used for mustard and ketchup, and 18 million units were used for miscellaneous purposes.

The producers of regular dispensers are Calmar (57.9 percent), Realex (21.4 percent), Speciality Management Products, Inc. (10.7 percent), Chesebrough-Pond's (8.6 percent) and Emson (1.4 percent). Chesebrough-Pond's, which once purchased regular dispensers from Realex, now manufacturers its own dispensers under a license from Realex. It does not sell to outside users.

2. *Regular Sprayers:* These are mechanical pump devices which emit a fine spray or droplets of liquid. They, too, fit on the tops of containers and are activated by means of a finger pressing on the pumping means. The total market for this product as shown in G–25, is 195 million units of which 45 million units were used for hair set and conditioners, 30 million units were used for window cleaners, 45 million units were used for automotive products, 15 million units were used for plant care, ten million units were used for furniture wax, ten million units were used for insecticides, ten million units were used for mouthwash, ten million units were used for all purpose cleaners, five million units were used for bathroom cleaners, and 20 million units were used for miscellaneous purposes.

The producers of regular sprayers are Calmar (60 percent), Realex (20 percent) and Specialty (20 percent).

3. *Fine Mist Sprayers:* These mechanical pump devices, as their name implies, produce a much finer spray than the regular sprayers. They are used on products such as perfumes. The total market for this product as shown on D–702, is 235 million units produced by Specialty (15 million units), Emson (60 million units), Seaquist (15 million units), Risdon (10 million units) and Calmar (135 million units).

4. *Large Dispensers:* These mechanical pump devices, as their name implies, are enlarged versions of regular dispensers and are used when a large volume of liquid is required. The total market for this product as shown on D–702, is 20 million units produced by Calmar (five million units), Realex (8 million units) and Continental (7 million units).

5. *Trigger Sprayers:* This trigger-type structure dispenses liquids in varying quantities and kinds of sprays. It is generally used on larger size containers both for esthetic reasons because of its size and for cost reasons. Pump dispensers and sprayers cost 10 to 15 cents each, trigger sprayers cost 20 to 30 cents each. According to the C.H. Kline and Co., Inc. report which accompanied Barry C. Harris' affidavit, 250 million units were sold in 1984. According to G–26, the producers of trigger sprayers are Calmar, Specialty, AFA, Continental, Texize and UDS.

6. *Dispensing Closures:* These items are also known as flip tops. They are used

to close a container and are constructed so they can be flipped open upon the application of finger pressure allowing the liquid to be released by pouring or squeezing the container. Flip tops are employed on a wide variety of containers having many of the same uses as containers which employ regular sprayers or regular dispensers. They are relatively inexpensive, costing two or three cents each. According to D–704, total production is 5,600 million units and among the producers of dispensing closures are Calmar, Realex, Seaquist, U.S. Cap and Closure, Polytop, Product Design and Engineering, Stull Engineering, Gibson, Wheaton, Sunbeam Plastics and other smaller producers.

7. *Aerosol Valves:* This kind of dispenser is used for a wide variety of products, many of which also use the other kinds of dispensers described above. The manufacturing process is very different from that used to make the other dispensers, and aerosol valves are more expensive. According to D–706, the total annual production was 2,400 million.

IV. *The Relevant Product Market*

As noted above, it is the government's contention that regular dispensers and regular sprayers each constitute a disrete product market. It argues that the fact that there is some cross-use between these products inter se and between these products and other types of sprayers or dispensers is insufficient to establish cross-elasticity of demand. In the light of the evidence, the government contends this limited interchangeability will not prevent Calmar, the corporation surviving the merger, from being in a position to make significant, long-term price increases not justified by costs.

The government points to Calmar's own financial documents prepared over the years which subdivided products into various categories, including regular dispensers and regular sprayers, and analyzed separately the sales to competition in each of those product markets. Realex' internal documents reflect similar analytical subdivisions.

The government produced as witnesses officials of seven users of regular dispensers and spray dispensers. They each testified generally to the same effect. Whether their company used a regular dispenser or a regular sprayer, it did so because the device produced the kind of output required for their product, because consumer preferences dictated its use, because it was necessary to use that kind of device to meet competitive products, because it was esthetically pleasing. For the same reasons that the particular device was used, the user would be reluctant to or refuse to shift to an alternative kind of dispensing device.

Faced with a one cent or two cent price increase, most of the seven witnesses testified that their company would probably not shift to another seller of dispensers; they would not seek a foreign supplier and they would not undertake to manufacture dispensers for their own use.

Those using finger pump dispensers were generally disinclined to use trigger pumps both because the large trigger device did not have an esthetic appeal and also because they cost significantly more. The relatively inexpensive dispensing closures or flip top devices were not used because customers were looking for the more convenient and better looking regular dispensers and sprayers.

None of the user-witnesses knew of any available foreign source of supply. A deterrent to changing suppliers would be the necessity for a new supplier to establish a track record and to provide assurance of the quality of the device and its ability to provide adequate service and continuing supply.

Aerosol valves were used to a small extent in connection with products which also used regular and spray dispensers. This reflects a definite consumer preference but not one which is of significant volume in most of these end use areas. There is very little likelihood that a significant price increase in other dispensers would result in a marked shift to aerosol valves.

1304

The government's economist, Dr. Kent W. Mikkelsen, gave an impressive presentation based upon an intensive analysis of the documentary material and upon interviews with users and suppliers. He concluded that a small but significant increase in the price of regular dispensers or regular sprayers would not cause a user to shift to an alternative product. Consequently he identified each product as a separate market.

Accepting these definitions of the product markets, after the merger Calmar would have approximately 80 percent of each, leaving Specialty as the only competitor (apart from Chesebrough which manufacturers its own regular dispenser and Emson which has only a 1.4 percent share of the regular dispenser market).

■ Persuasive as the government's evidence and experts were, I conclude that the government has defined the product market too narrowly. There were exhibited to the Court and there has been testimony about a dizzying variety of combinations of end users and dispensing devices. For each use, such as window spray, liquid soap and hand lotion, more than one kind of dispensing device was used by one or another manufacturer. Some manufacturers of hand lotion use regular dispensers; others use flip top dispensers. The same was true of liquid soap. Some manufacturers use different dispensers on the same kind of product. For example, Drackett, the manufacturer of Windex, uses for that product an aerosol valve, a regular sprayer, a trigger sprayer and (for refill size containers) a cap. Drackett uses a finger pump on its eight-ounce container while one of its competitors uses a trigger pump on its eight-ounce container.

Of necessity, the government's testimony was anecdotal in nature—the observations of a few of the many hundreds and perhaps many thousands of users of dispensing devices. The testimony reflected in part the inertia of any manufacturer to change its methods or source of supply. It did not reflect the choice which would be made by new users of dispensing devices entering the market for the first time, an event which must occur with great frequency. the fact that for planning and other purposes Calmar separated and reported on regular dispensers and regular sprayers while relevant, is not determinative for the purposes of defining the relevant market under the antitrust laws.

Defendants' expert, Dr. Barry C. Harris, applied substantially the same methodology as Dr. Mikkelsen, and as can be expected, came to a different conclusion. The survey he caused to be conducted identifying end uses of sprayers and dispensers demonstrates further the potential for substitution of other closures for regular and spray dispensers.

Further, Dr. Harris analyzed the potential for supply substitution. Virtually identical procedures are used in making regular and spray dispensers, fine mist sprayers, large dispensers and trigger sprayers. Each of the manufacturers of any one of them could, without undue difficulty, commence production of any one of the other devices should a price increase induce it to do so.

A market cannot be defined with absolute certainty. In the present case I believe the government has drawn too tight a net. I believe the defendants would stretch it too far.

While there is a likelihood that users would move rather readily between the different kinds of pump dispensers and sprayers and that suppliers of these devices would shift from producing one to another in response to shifting prices and demand, there would be a lesser degree of shifting from pump dispensers and sprayers to aerosol valves and to dispensing (or flip top) closures. These latter two devices are quite different in style and principle from the pump devices. The costs are very different; at least in the case of the aerosol valve, the suppliers of pump devices could not as readily shift to or undertake the manufacture of such valves. The manufacturing techniques are quite different from those employed to make plastic pump dispensers.

I conclude, therefore, that the relevant market includes regular sprayers, regular dispensers, fine mist sprayers, large dispensers and trigger sprayers. Annual production in units per company in this market and the percent of market share of each is shown in D–707 and is as follows:

Calmar, 375 million units, 41 percent of the market.

Realex, 78 million units, 9 percent of the market.

Specialty, 160 million units, 18 percent of the market.

Emson, 62 million units, 7 percent of the market.

Seaquist, 15 million units, 2 percent of the market.

Risdon, 10 million units, one percent of the market.

Continental, 45 million units, 5 percent of the market.

Chesebrough-Pond's, 12 million units, one percent of the market.

AFA, 50 million units, 6 percent of the market.

Texize, 95 million units, 10 percent of the market.

UDS, 2 million units, less than one percent of the market.

A total of 904 million units comprising the entire market.

Between them Calmar and Realex have 50 percent of the market, which would give Calmar 50 percent of the market after the merger. The four-firm concentration factor is now 78 percent. After the merger it would be 85 percent. The HHI is now 2,302. It would increase by 738 in the event of the proposed merger.

■ Thus the merger will result in a degree of concentration which establishes prima facie that it is likely to cause a substantial lessening of competition. It is therefore necessary to determine if the ease of entry overcomes this prima facie case.

## V. *Ease of Entry*

The testimony of Karl J. Stringer, vice-president of logistics and information services of the Drackett Corporation, is instructive. Drackett purchases a substantial number of regular sprayers and trigger sprayers for its Windex product. Drackett has changed the type of dispensers it uses over the years and it carefully monitors the prices it pays for these devices. It requires that any price increase be justified on a cost basis. Mr. Stringer testified that if its supplier of regular sprayers and trigger sprayers, Calmar, increased its prices beyond cost, Drackett would refuse to pay the increase and would divert its business elsewhere. He doubted that Drackett would commence making its own sprayers, but it would consider entering into a joint venture with another company as it did with Emson when it sought an additional supply of trigger sprayers.

Other users undoubtedly also monitor prices and could be expected to look for new sources of supply if faced with an unjustified price increase. Suppliers of pump dispensers undoubtedly monitor prices being charged by their competitors and, if entry were feasible, could be expected to shift, increase or institute production of particular kinds of pump dispensers in response to unjustified price increases by competitors.

The evidence establishes that entry into the pump dispenser market would be relatively easy.

There are no patents which bar use of any of the devices or processes of manufacturing them. The products are inexpensive and simple in design.

The injection molding process used by those who make plastic dispensing devices is the same as the injection molding process used to make countless other small plastic products. There are many molders capable of duplicating any of the products in the relevant market. The assembly of the plastic parts does not differ significantly from the assembly of other plastic products and can be accomplished by many firms.

Calmar developed the first plastic sprayer in the early 1950's. Since that time Realex and the other firms in the market defined above have entered the market with their own products. The cost to enter the market would not be substantial. Brian J. Armour, vice-president and general manager of a mold building firm, estimated how much it would cost to enter the market with a product identical to one of Calmar's successful dispensing pumps. He concluded that it would require approximately half a million dollars to build the mold, arrange for custom molding and assembly and market. In six months he would expect to have a marketable product and in one year he would expect to have a profitable operation.

While Mr. Armour had a little difficulty with his arithmetic and with typographical errors in his report, his conclusions are unrebutted and appear to be sound. Other evidence generally supports his conclusion. Donald C. Kirk, production manager of Specialty, described the actual introduction of a product for about double the cost Armour estimated. However, unlike Armour's hypothetical, which assumed that an existing successful product would be copied, Specialty developed an entirely new product, starting in May 1981 and making shipments by December 1982. Significantly, Specialty performs only 15 percent of its molding work, contracting out 85 percent. This points up the fact that an entrant need not have its own factory either to do the molding or assembly. Some existing suppliers of pump dispensers contract out this work and are little more than sales corporations. New entrants could do the same.

The history of the industry supports the conclusion that entry is not difficult.

Originally Calmar had a monopoly. Realex, which was in the insecticide business, decided to produce its own pump sprayer, which it successfully did. At first it manufactured sprayers for its own use only. Subsequently it expanded the product line and sold to others.

Specialty, originally an aerosol valve manufacturer, developed a fine mist sprayer in 1964 and since then has introduced regular sprayers and regular dispensers.

AFA, Continental, Texize and UDS entered the trigger sprayer market.

Emson, Risdon and Seaquist entered the fine mist pump field in the mid-1970's in response to the ozone scare which adversely affected sales of aerosol valves. Emson later introduced a pump dispenser in 1982.

For many years Chesebrough-Ponds purchased pump dispensers from Realex. It decided to manufacture its own pump dispensers and now does so, paying a modest license fee to Realex.

The evidence leads to the conclusion that even after the proposed merger the ease of entry into the market would prevent any supplier from exercising market power. A significant sustained price increase most likely would result in a number of reactions in the market. Users either would commence manufacturing their own pump devices or would enter into a joint venture with someone else to do it or would find another source of supply. Present suppliers would increase production or institute production of the products whose price had been raised. New suppliers would come into the market. Surely Calmar is aware of the likely response to an unjustified price increase and would price its products accordingly.

An examination of the premerger market behavior confirms these observations. Even before merger there was a high degree of concentration. The four-firm competition factor was 78 percent; the HHI was 2302, well above the Department of Justice's 1800 level for high concentration. Yet though Calmar had 41 percent of the market, its prices did not even keep pace with inflation. When its share rises to 50 percent, it is highly unlikely that the market dynamics will change. The reason for this is the ease of entry.

Therefore, I conclude that despite the high concentration of the combined market share of Calmar and Realex, the government is not likely to be able to establish at a final hearing that the merger will violate

Section 7 of the Clayton Act. This is because it is likely that defendants will be able to prove that the potential entry by new or existing firms into the pump dispenser market as I've defined the market above will prevent sustained unjustified price increases by the merged firm. For example, *United States v. Waste Management, Inc., supra.*

I have pursued the usual step-by-step procedure of determining the relevant market, examining the market structure before and after the merger, and analyzing the mitigating factors. However, if one were to look at the totality of this particular market, one notes that it is so fluid and volatile both from the perspective of the product user and from the perspective of the product supplier, that it is unlikely that any firm, no matter how great its market share may be at any given time, could exercise market power very long. Let me note some of these factors.

1. The products themselves are simple, inexpensive, easily duplicated and easily modified or adapted to countless uses and esthetic tastes.

2. The use of these pump dispensers are as numerous as there are liquid products which must be extracted from containers.

3. There are a number of alternatives to pump dispensers which are or can be used.

4. Consumer tastes for the manner of dispensing liquids and for the appearance of the dispensing agent vary widely and shift. These shifts may appear to be spontaneous or they may be a response to promotional efforts of the sellers of liquid products.

5. There are alternative ways that a user can obtain pump dispensers—from various existing suppliers, by manufacturing them themselves, by assisting or joining with a new supplier to commence production.

6. A large number of firms have the capabilities of manufacturing any of the kinds of dispensing pumps which were in the market.

The degree of concentration of the pump dispenser market after the merger of Calmar and Realex would be so great that the Department of Justice had an obligation to challenge the merger on antitrust grounds. However, Calmar and Realex have sustained their burden of establishing, at least at this point in the case, that in this particular market the degree of concentration will not result in a substantial lessening of competition.

The government having failed to establish that it is likely to succeed on the merits, its application for a preliminary injunction will be denied.