The STATE OF CALIFORNIA, by Its Attorney General John K. VAN de KAMP, Plaintiff,

v.

AMERICAN STORES COMPANY, Alpha Beta Acquisition Corp., Lucky Stores, Inc., Defendants.

No. CV 88–5331 KN.

United States District Court, C.D. California.

Sept. 29, 1988.

John K. Van de Kamp, Los Angeles, Cal., pro se.

Andrea Sheridan Ordin, Sanford N. Gruskin, Owen Lee Kwong, H. Chester Horn, Jr., Lawrence R. Tapper, Ernest Martinez, Los Angeles, Cal., for State of Cal.

Frank Rothman, Stephen M. Axinn, Paul T. Denis, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendants.

## ORDER RE PRELIMINARY INJUNCTION; PRELIMINARY INJUNCTION

KENYON, District Judge.

The Court, having received and considered Plaintiff State of California's Application for a Preliminary Injunction and the papers filed in support thereof and in opposition thereto, HEREBY GRANTS Plaintiff's application.

## I. BACKGROUND

Plaintiff, State of California, through its Attorney General, John K. Van de Kamp, ("State") brought this action to enjoin the merger of the assets and businesses of Lucky Stores, Inc. ("Lucky") and American Stores Company, Alpha Beta Acquisition Corporation, and their respective subsidiaries ("Alpha Beta").

The parties to this proposed merger are the first and fourth largest supermarket chains in California and two of the ten largest grocery chains in the United States. Both Alpha Beta and Lucky are principally engaged in the retail sale of food and related products for off-premises consumption. In California, Alpha Beta operates 252 "Alpha Beta" and "Skaggs Alpha Beta" retail supermarkets. Lucky operates 340 "Lucky Stores" and "Lucky Food Basket" retail supermarkets. Memorandum In Opposition to Motion For Preliminary Injunction at 4 ("Opp. to Inj."). The proposed Lucky/Alpha Beta acquisition follows on the heels of a merger by the second and third largest grocery chains in California, Vons and Safeway.

The State's purpose in seeking the preliminary injunction is "to maintain the status quo for consumers—the existence of at least three competing supermarket chains." Memorandum of Points and Authorities in Support of Application for Temporary Restraining Order at 4 ("TRO Application"). The State maintains that the effect of the Lucky/Alpha Beta proposed merger may be substantially to lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Section 1 of the Sherman Act, 15 U.S.C. § 1; the Cartwright Anti-Trust Act, California Business and Professions Code, sections 16770, *et seq.*; and the Unfair Business Practices Act, California Business and Professions Code, sections 17200, *et seq.*

## II. DISCUSSION

In order to grant a preliminary injunction, the Court must consider the following factors: (1) Whether plaintiff has demonstrated, at the minimum, a fair chance of success on the merits. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir. 1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); (2) Whether plaintiff has demonstrated a significant threat of irreparable injury. *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985); and (3) Whether plaintiff has demonstrated at least a minimal tip in the balance of hardships even when the strongest showing on the merits is made. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1203–04 (9th Cir.1980). As the Ninth Circuit stated in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 87 (9th Cir.1975), a court may issue a preliminary injunction if the moving party demonstrates "either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." The court has stated that these two tests are not inapposite but merely extremes of a single continuum:

> The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly.

*Benda,* 584 F.2d at 315. In *FTC v. Warner Communications Inc.,* 742 F.2d 1156, 1162 (9th Cir.1984), the Ninth Circuit reversed the district court's denial of the Federal Trade Commission's ("FTC") application for a preliminary injunction on the grounds that the government had adequately met its burden of demonstrating likelihood of success on the merits. The FTC brought an action to block a proposed joint venture involving two record companies. In determining whether 'likelihood of success' had been established, the court noted that its task was "not to make a final determination on whether the proposed merger violates Section 7 (of the Clayton Act), but rather to make only a preliminary assessment of the merger's impact on competition." *Id.*

## A. *The Prima Facie Case*

■ Case law has established guidelines for determining whether the effect of a proposed merger may be "substantially to lessen competition" in violation of the Clayton Act.

[A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963) (finding that where top four firms had market share of 78%, post-merger market share raised inference merger was anticompetitive). The Court further stated that "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *Id.* at 365 n. 42, 83 S.Ct. at 1742–43 n. 42. Statistical evidence of market share and concentration resulting from a merger can establish a prima facie case or the presumption that the proposed merger would substantially lessen competition in violation of the Clayton Act. *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974). The presumption of a Clayton Act violation based on the post-merger market statistics is not conclusive and can be overcome, but only by a showing that the statistics do not accurately reflect the probable effect of the proposed merger on competition. *Id. See also United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed. 2d 530 (1974).

Recent cases use a variety of statistical indicators to determine whether a proposed merger can be presumed to substantially lessen competition. Post-merger market share is one indicator. Indicators of market concentration can be developed by determining the total percentage of market share held by the top two, three, four, etc. firms before and after the merger. The Herfindahl–Hirshman Index, ("HHI"), is another means to analyze market concentration. The HHI is calculated by summing the squares of the percentages of market share held by each of the firms in a given market, and therefore reflects the distribution of the market shares of the entire market, not just the top few firms.

Under the 1984 version of the Merger Guidelines of the United States Department of Justice, an HHI between 1000 and 1800 suggests a moderately concentrated market, and an HHI above 1800 suggests a highly concentrated market. Where the post-merger market would be in the moderately concentrated range, a merger that increases the HHI by more than 100 points will, absent other factors, present serious antitrust questions. Where the post-acquisition market would be highly concentrated, an increase of more than 50 HHI points will present serious antitrust questions. Dept. of Justice, *Merger Guidelines,* ¶ 2, 49 Fed.Reg. 26823 (1984). *See, e.g., RSR Corp. v. FTC,* 602 F.2d 1317 (9th Cir.1979) (merger of second and fifth largest firms found anticompetitive where result was post-merger market share increase from 12% to 19%, four-firm concentration increase from 65% to 72%, and eight-firm concentration increase from 81% to 84%); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., Inc.,* 600 F.Supp. 1326 (E.D.Mich.), *aff'd,* 753 F.2d 1354 (6th Cir.1985) (proposed merger found to substantially lessen competition based on statistical evidence of post-merger market share of 31%, four-firm concentration increase from 78% to 89%, HHI increase from 1746 to 2120, and general trend toward concentration); *Marathon Oil Co. v. Mobil Corp.,* 530 F.Supp. 315 (N.D.Ohio), *aff'd,* 669 F.2d 378 (6th Cir.1981) (acquisition enjoined based on post-merger combined market share of 10–20% in relevant markets, four-firm concentration increase from 48% to 53% on average, and general trend toward concentration.) *Cf. United States v. Waste Management, Inc.,* 743 F.2d 976 (2d Cir.1984) (prima facie illegality

of merger based on post-merger market share of 49% successfully rebutted by evidence that market power did not result).

■ In order to analyze whether the statistical evidence of market concentration resulting from a particular proposed merger establishes a presumption that the merger may substantially lessen competition in violation of the Clayton Act, the relevant product and geographic markets in which competition may be affected must be defined. *Marine Bancorporation,* 418 U.S. at 618, 94 S.Ct. at 2868. "[T]he outer boundaries of a product market can be determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *RSR,* 602 F.2d at 1317, 1320, citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–1524, 8 L.Ed.2d 510 (1962). The effects of a merger must also be examined in each well-defined and economically-significant product submarket. *Id.* at 1320–21. Products which are reasonably interchangeable are "products to which consumers would switch if there were a small but significant non-transitory price increase." *United States v. Calmar, Inc.,* 612 F.Supp. 1298, 1301 (D.N.J.1985).

The State defines the relevant product market in this case as "supermarkets," full line grocery stores with more than 10,000 square feet. The State contends that, realistically, only such supermarkets compete for the consumers' weekly or periodic grocery shopping needs and other outlets which also sell groceries, such as convenience stores, etc., serve consumers' needs in a distinctly separate market. TRO Application at 10–12. Defendants, on the other hand, contend that the relevant product market includes retail grocery purchases from a far wider range of outlets and should include groceries sold by smaller "mom and pop" retail grocery stores, convenience stores, and non-grocery stores such as department stores, gasoline service stations, eating and drinking places, drug stores, and liquor stores. Max Supp. Decl. at 2. Defendants argue that these outlets directly compete with supermarkets for the grocery dollar of the consumer, and contend, for example, that convenience stores frequently match or undercut supermarket prices. Opp. to Inj. at 13–14. *Cf. The Grand Union Co.,* 102 F.T.C. at 1046–47 (noting that determination of which non-supermarket food retailers to include in product market line is somewhat arbitrary).

The Court is not persuaded that the relevant product market in this case contains food purchases from the broad range of outlets contended by defendants, nor that grocery shoppers seriously consider, for example, gasoline service stations or department stores as competing sources with supermarkets for their grocery needs. Even if convenience stores competitively price a few food items, such as bread and milk, in direct competition with supermarkets, such is not sufficient to justify inclusion of all retail grocery sales from whatever outlet in the relevant product market in this case. In fact, the State has presented evidence that defendants' own marketing documents focus on supermarket shoppers and competition from other supermarkets and do not evaluate convenience stores, gasoline service stations, etc. as competitors. TRO Application at 11.

The relevant geographic market must "correspond to the commercial realities of the industry and be economically significant." *RSR,* 602 F.2d at 1323, quoting *Brown Shoe,* 370 U.S. at 336–37, 82 S.Ct. at 1529–30. Defendants define the relevant geographic area as 14 individual Metropolitan Statistical Areas, ("MSAs"), as defined by the Office of Management and Budget.[1] Opp. to Inj. at 9. The State, however, contends that these areas are too large to represent a relevant geographic market and that they ignore natural boundaries and practical realities. For example, the San Diego MSA is an area 60 miles by 60 miles, Transcript of Proceedings, September 16, 1988, at 63, an area which the

---

1. The 14 MSAs are: Los Angeles, Santa Barbara, Anaheim, Bakersfield, Oxnard/Ventura, Riverside/San Bernardino, San Diego, Oakland, Monterey/Salinas, San Francisco, San Jose, Santa Cruz, Santa Rosa, and Vallejo/Napa.

State contends is too large to represent the trading area served by an individual grocery store, and which aggregates stores which are simply not in substantial competition with each other. The state argues that, instead, there are a number of distinct markets within these 14 MSAs totaling 62 separate relevant geographic markets. TRO Application at 12–15; Harris Decl. at 33–54.

However, because acceptance of either of these definitions of relevant geographic markets is not dispositive to the outcome of the current analysis, the Court will for now assume that the defendants can prevail at trial on their contention that the relevant geographic markets are represented by the fourteen MSAs they have defined.

As defined above, the statistical indicators of market share and concentration in the relevant markets resulting from the proposed merger of the Lucky and Alpha Beta supermarket chains can be analyzed to determine whether the merger is inherently likely to lessen competition substantially. Across the fourteen MSAs defined by defendants, the post-merger market share would be significant, averaging 24%, with a range from 15% to 38% in individual MSAs. Two firm concentration would increase from a pre-merger average of 51% (range, 35%–70%) to a post-merger average of 56% (range, 46%–73%). Four-firm concentration would increase from an average of 73% (range, 62%–84%) to a post-merger average of 79% (range, 67%–88%). Harris Decl., Appendix II at 111–320. These numbers indicate the proposed merger would result in further concentration of an already highly concentrated market. Even using the defendants' more expansive definition of the relevant product market, the post-merger market share would still be significant, averaging 19%, and the four firm concentration would be 56%, still indicating a highly concentrated market. De-

fendants' Supplemental Memorandum Re Market Definition and Market Structure, Exh. B ("Def. Market Memo.").

The parties submitted vast quantities of data showing calculation of post-merger HHIs and the corresponding HHI increase resulting from the proposed merger. Suffice it to summarize that across the 14 MSAs defined in this case and based on "supermarkets" as the relevant product market, post-merger HHIs average 2040 (range, 1416–2769), with 10 of the 14 MSAs individually exceeding the 1800 level, indicating a highly concentrated market. The increase in HHI due to the proposed merger averaged 245 points across the 14 MSAs and was at least 100 points in each MSA, therefore raising serious antitrust concerns.[2] Harris Reply Decl. at 17.

Even considering the more expansive relevant product market definition argued by the defendants, the Court notes that the first set of data supplied by defendants showed an average post-merger HHI across the 14 MSAs of 1250, with an average increase in HHI due to the merger of 130 points. Max Decl., Exh. 3 at 38. Such numbers indicate antitrust concerns and, specifically, in 9 of the 14 individual MSAs, the individual post-merger HHI and corresponding HHI increase indicated antitrust questions. Defendants subsequently expanded their definition of the relevant product market even further, and therefore produced a second set of data bringing the average post-merger HHI down to 990, with an average increase of 100 points, and specifically showing antitrust concerns under the Merger Guidelines in only three individual MSAs. Def. Market Memo., Exh. A; Max Supp. Decl., Exh. 5. Defendants contend that these numbers show that none of the relevant markets will be unduly concentrated or significantly increased in concentration as a result of the proposed merger. Def. Market Memo. at 22.[3]

---

**2.** If the relevant geographic market is defined in terms of 62 smaller geographic markets as contended by the State, the post-merger HHI averages 2380, with an average increase of 250 points due to the proposed merger. Harris Decl. at 69–70.

**3.** Defendants contend that their updated calculation of, for example, the Santa Cruz MSA's post-merger HHI (by their most recent and expansive product market definition) at 998 conclusively raises no competitive concerns despite an HHI increase of 110 points, while implicitly stating that competitive concerns would be

The Court also requested additional briefing by the parties on market share trends in the relevant markets. Although the defendants contend that their data shows a decrease in market concentration, Def. Market Memo. at 3, the more extensive data provided by the State clearly shows a substantial trend to increased concentration in all but one MSA using the State's definition of the relevant product market, and in at least two-thirds of the relevant MSAs using defendants' definition of the relevant product market. On average across all MSAs, concentration in the relevant product markets as defined by either party's definition has increased by over 30% since 1982, excluding the effects of this proposed merger. Harris Supp. Reply Decl. at 5–17.

■ The Court finds that the statistical evidence concerning post-merger market shares and concentration, as well as market concentration trends, overwhelmingly creates the presumption that the increased concentration in the relevant markets which would result from the proposed merger between the Lucky and Alpha Beta supermarket chains would substantially lessen competition in those markets, and presents a prima facie violation of Section 7 of the Clayton Act.

B. *Ease of Entry*

■ The presumption that a proposed merger violates the Clayton Act if it results in a certain percentage of market share is not irrebuttable. *United States v. General Dynamics*, 415 U.S. 486, 494–504, 94 S.Ct. 1186, 1192–1197, 39 L.Ed.2d 530 (1974). The presumption can be overcome by evidence that the market share statistics give an inaccurate account of the merger's probable effect on competition. *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975). The burden of proof, however, rests squarely on defendants. *Marine Bancorporation*, 418 U.S. at 618, 94 S.Ct. at 2868. Therefore, even if a

merger results in a high degree of concentration, if a firm can easily enter into the market, it is unlikely that the remaining producers in the market will be able to exercise market control. *United States v. Calmar, Inc.*, 612 F.Supp. 1298, 1301 (D.N.J.1985).

In general, the lower the barriers to entry, the less likely it will be that, as a consequence of acquisition, remaining firms in the target market can successfully raise prices by "unilateral action, interdependent coordination or express collusion." *United States v. Hughes Tool Co.*, 415 F.Supp. 637, 644 (C.D.Cal.1976) (stating that substantial entry and exit rates in firms and products indicates that entrance is relatively easy and that healthy competition is present within relevant market). On the other hand, where barriers to entrance into the target market are high, a merger or acquisition may create a potential for significant market power that is "unlikely to be tempered by the threat that future entry will prevent or frustrate anticompetitive output and pricing decisions by firms in the target market." *The Grand Union Co.*, 102 F.T.C. 812, 1064 (1983). Evidence of low entry barriers includes recent entry into the target market, or recent capacity expansion by existing competitors in that market. *Id.* In *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250, 1263 (E.D.Pa.1987), the court found substantial barriers to entry in the snack cake and pie business. The barriers plaintiffs' experts discussed included the high cost to build bakeries; to develop brand recognition; and to establish routes with favorable retailer participation. *Id.* In concluding that defendants had failed to meet their burden of proof that entry barriers did not exist and in granting a preliminary injunction, the court stated that since "[d]efendants presented no significant evidence that existing producers will enter these relevant markets as new competitors within the foreseeable future, ... I find plaintiffs likely to prove that the existing market shares provide a meaningful basis on which

raised if the Santa Cruz post-merger MSA had been 1001. Max Supp. Decl. at 3. Such precision, however, is more than the calculation of

HHIs, as indicators of market concentration and antitrust concerns, can conclusively provide.

to evaluate the future significance of the acquisition." *Id.* at 1264.

While the Supreme Court has never directly held that ease of entry may rebut a showing of prima facie illegality under *Philadelphia National Bank*, it has held that potential competition from firms not presently active in the relevant product and geographic markets must be taken into account. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (concluding that existence of Falstaff brewer as potential entrant might constrain brewers in northeast to maintain competitive price levels as means of forestalling entry by Falstaff). *See* 4 von Kalinowski, Antitrust Laws and Trade Regulation § 19.02[3] n. 120 (1979) (stating that conditions of entry have been identified as one of the two most important factors constraining a firm to behave competitively, the other factor being "numbers").

In *United States v. Waste Management, Inc.*, 743 F.2d 976, 981 (2d Cir.1984), the court considered ease of entry in the trash collection market and concluded that entry into the market was "so easy that any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation." As foundation for this conclusion, the court stated that "[a] person wanting to start in the trash collection business can acquire a truck, a few containers, drive the truck himself and operate out of his home." Entrants into the supermarket industry, unlike the trash collection market, can face a much more complex array of barriers. Typically, the ease or difficulty with which a firm can enter a given industry depends on such factors as: (1) amount of capital necessary to become a competitor in the market; (2) availability of capital; (3) availability of technological advancements; (4) number and size of customers or firms already operating in the market; and (5) structure and nature of the industry. 4 Antitrust Laws and Trade Regulation § 19.02[3].

■ As the Supreme Court stated in *Marine Bancorporation*, 418 U.S. at 602, 94 S.Ct. at 2860, the burden is on defendants to rebut the presumption of illegality demonstrated by the market share percentage. Defendants have failed to demonstrate evidence of low entry barriers. Although defendants assert that entry into the California market is easy, their lack of evidence to support this contention produces an inference to the contrary. According to defendants, supermarkets in California can be opened rapidly and without obstacles in response to any opportunity to earn a good level of return. Max Decl. at 14. Yet, defendants have produced no evidence of such an occurrence. Moreover, defendants' declarations assert that sites for new construction or remodeling are readily available but fail to explain who has taken advantage of this abundance of available space. Guillory Decl. ¶ 5–9. Defendants submit through a declaration of Keith Thye that entry is further facilitated by grocery product wholesalers actively involved in selecting and obtaining sites for new entrants; financing the purchase of inventory, fixtures and equipment; and providing back office assistance such as data processing. Thye Decl. ¶ 9–11. Mr. Thye, president and Chief Operating Officer of Market Wholesale Grocery Co., however, plans to purchase 15 of the 37 stores that Alpha Beta and Lucky are required to divest in accordance with the FTC consent order. Consequently, entry barriers may not appear to him to be too high. Defendants also submit the declaration of Richard London, an independent consultant to Lucky Stores and president of Major Market, Inc., a company formed to open, own and operate a chain of grocery stores in Southern California. Mr. London contends that the grocery business is extremely competitive, that entry barriers are low, and that there is certainly room for a new chain of grocery stores in the Southern California area. London Decl. ¶ 7–8. However, defendants' declarations appear to be based on entry into a far broader product market than the Court believes is appropriate. See discussion, *supra* at 1129.

The defendants advance the additional argument that the merger can be justified because it allows greater efficiency of oper-

ation. Lillie Decl. ¶ 5. John M. Lillie, chairman of the board and chief executive officer of Lucky, declared that the blending of Alpha Beta and Lucky's manufacturing plants, warehouses and transportation system coupled with further efficiencies and synergies will result in approximately $50 million in annual shelf price reductions to California consumers. *Id.* Edgar H. Grubb, senior vice president and chief financial officer of Lucky, stated that efficiencies resulting from the combination of Lucky and Alpha Beta will generate annual cost savings of at least $78.1 million. Grubb Decl. ¶ 6. The Supreme Court has clearly rejected this efficiency argument in *Philadelphia National Bank*, 374 U.S. at 370, 83 S.Ct. at 1745, and the Ninth Circuit reiterated the rejection in *RSR Corp.*, 602 F.2d at 1325. In *RSR*, the court stated, "RSR argues that the merger can be justified because it allows greater efficiency of operation. This argument has been rejected repeatedly." *Id.* Moreover, even assuming these efficiency savings do result, the Court is not convinced that defendants will invariably pass these savings on to consumers. As the State queried, "And, most importantly, is it really true that the new firm can achieve $50 million in savings after servicing the debt they assumed in leverage [sic] this $2.5 billion buy-out?" Supplemental Memorandum of Points and Authorities in Support of Plaintiff's Application for a Preliminary Injunction at 8 ("Pl. Supp. Memo."). The State asserts, to the contrary, that prices will rise since there exists a direct correlation between increased concentration and high prices. Mueller Reply Decl. ¶ 6. The Court concludes that defendants have not met their burden of demonstrating that the statistics do not accurately reflect the probable effect of the proposed merger on competition. *Marine Bancorporation*, 418 U.S. at 631, 94 S.Ct. at 2874–75.

## C. *Injunctive Relief Under the Clayton Act*

■ Section 16 of the Clayton Act allows any person to sue for injunctive relief against threatened loss or damage by a violation of the antitrust laws. 15 U.S.C. § 26 (1979). Section 16 is designed to stop anticompetitive behavior in its incipiency. The Ninth Circuit in *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.* ("ITT"), 518 F.2d 913, 925 (9th Cir.1975), found that injunctive remedies under § 16 "may be as broad as necessary to ensure that threatened loss or damage does not materialize or that prior violations do not recur." The court further stated that if the direct injunctive restraint proves too burdensome, then "a possible recourse [for the enjoined party] is to stipulate to divestiture as an alternative." *Id.*

The State requests a preliminary injunction "preventing and restraining [Alpha Beta and Lucky], and all persons acting on their behalf, from taking any action, either directly or indirectly, in furtherance of the proposed acquisition of Lucky, and requiring Alpha Beta to hold and operate separately all of Lucky's California assets and businesses pending final adjudication of the merits of this action; and ... such injunctive relief, including recission ... as is necessary and appropriate to prevent the effect of the unlawful activities alleged." Complaint at 14. Furthermore, the State seeks to "permanently enjoin [Alpha Beta and Lucky] from carrying out any agreement, understanding, or plan, the effect of which would be to combine the supermarket business of [Alpha Beta] and Lucky." *Id.*

Defendants maintain that a permanent injunction is tantamount to divestiture since Alpha Beta and Lucky have already merged and the egg has already been scrambled. This argument, however, contravenes the very purpose of the Federal Trade Commission Agreement to Hold Separate ("Hold Separate Agreement"). According to the Hold Separate Agreement of May 18, 1988, "[Alpha Beta] shall hold separate ... the Lucky California Operation ("California Operation") which consists of 362 grocery stores, inventory, trademarks and trade names, warehouses, distribution and manufacturing facilities and all related property and facilities." Under the Hold Separate Agreement, Alpha Beta is required to:

* assure that the California Operation maintain separate financial and operating books and records;

* prevent any waste or deterioration of the California Operation;

* refrain from replacing any executive of the California Operation except to fill a vacancy;

* assure the maintenance of the California Operation as a viable competitor while allowing the California Operation warehouse, distribution and manufacturing facilities to supply stores operated by Alpha Beta during the pendency of the Hold Separate Agreement;

* refrain from selling or otherwise disposing of the warehouse, distribution or manufacturing facility or any retail grocery stores of the California Operation during the pendency of the Hold Separate Agreement;

* separate purchasing for the Alpha Beta and California Operation so that it is done by each entity for its retail grocery sales.

FTC Hold Separate Agreement, ¶ 3 (a)–(f). The Hold Separate Agreement is still in effect. If the Hold Separate Agreement has meaning, this is *not* a completed merger. Alpha Beta and Lucky, pursuant to the Hold Separate Agreement, are performing numerous functions as separate entities. They retain their separate names and with them their respective corporate identities. While defendants maintain that it is "verbal calisthenics" [4] to issue injunctive relief to stop a merger contending that such is tantamount to divestiture, they, nevertheless, ask the Court to perform a linguistic triathalon to understand how a Hold Separate Agreement is equivalent to a complet-

ed merger. The Court is unable to make such a leap in reasoning.

### 1) Whether Plaintiff Has Shown Irreparable Injury

The State, acting in its capacity as *parens patriae* on behalf of its residents, has alleged that Californians will be irreparably harmed if the proposed merger is completed. Lessening of competition, the State maintains, is recognized as precisely the kind of irreparable injury that the interlocutory remedies under the Clayton Act were intended to prevent. TRO Application at 32. Unless restrained, the State submits that defendants will rapidly restructure the newly-acquired company and its assets and disable the acquired chain from operating independently of the parent. *Id.* As the Court stated in *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F.Supp. 1326, 1332 (E.D. Mich.), *aff'd*, 753 F.2d 1354 (6th Cir.1985), prospective relief is a more effective remedy for an unlawful merger than retrospective relief. Moreover, if preliminary relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger. *Id.* If the Court is to make a determination as to whether this merger is anticompetitive, the State is correct in its assertion that the egg must be examined before it becomes an omlette. The Court therefore finds that plaintiff has made an adequate showing of irreparable injury.

### 2) Balancing the Hardships

Defendants argue that if preliminary relief is granted, they will suffer irreparable harm which far outweighs any possible risk that the proposed merger will lessen com-

---

**4.** The Ninth Circuit, in *ITT* warned against indirect divestiture, enjoining the activities of a corporation to such a degree that divestiture would be the only economical choice available to that corporation. *ITT*, 518 F.2d at 924. In the next paragraph of the opinion, the court goes on to say that while divestiture is not available, injunctive remedies may be as broad as necessary to ensure that threatened loss or damage does not materialize. *Id.* Unlike the Ninth Circuit cases addressing the issue of the availability of divestiture, the instant case involves a Section 7

attack on a proposed merger which has an FTC hold separate order in place. In *ITT* plaintiff brought suit in 1967 to force the divestiture of subsidiaries defendant had acquired beginning in 1950. *Id.* at 915. *See also Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 692 (9th Cir.1976) (plaintiff sought relief directed to a subsidiary defendant had acquired at least one year before); *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602, 607 (9th Cir.1977) (plaintiff, former shareholder, sought to recover stock pledged on loan subsequently foreclosed upon).

petition. According to defendants, Alpha Beta already has spent $2.5 billion to acquire Lucky; has sold or entered into contracts to sell substantial assets of Lucky; and has placed its Alpha Beta operations under the control of the Lucky management with the full knowledge of the State. Opp. to Inj. at 12. Furthermore, defendants maintain that the State is guilty of laches for delay in bringing this antitrust suit.

Although the Court agrees that suits of this sort must be filed in a timely manner, the Court finds that the State conducted this investigation as swiftly as was responsibly possible; informed defendants that the State intended to have the procedures contemplated by the Hart–Scott–Rodino Act run their course; and repeatedly warned Alpha Beta that failure by the FTC to remedy the State's antitrust concerns could result in this action. Pl. Supp. Memo. at 8. On May 31, 1988, the FTC tentatively approved the merger. During the public comment period following the tentative approval, the State filed comments urging the FTC to withdraw its tentative consent order for the Lucky/Alpha Beta merger. On August 31, 1988, the FTC gave final approval of Alpha Beta's acquisition of Lucky subject to divestiture of 31 to 37 stores. The State filed suit on September 1, 1988. Defendants claim that injunctive relief must be denied because the State unconscionably delayed by not bringing this action before closing of the agreement between Lucky and Alpha Beta on June 2, 1988. Opp. to Inj. at 4, 30. It does not seem unreasonable for the State to have refrained from filing suit prior to even preliminary FTC approval. To require, however, that they then file their action within a narrow three-day window would be unreasonable. As the First Circuit stated in *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 430 (1st Cir.1985):

> [I]t is contrary to equitable principles to permit some defendants to maintain an illegal market share merely because they were able to merge before any of their competitors could prevent it. This places a premium on gamesmanship and stealth, and allows anticompetitive mergers to be treated differently on the basis of the speed and skill with which the merger is consummated. Unfortunately, the public is also the loser under such an approach as it cannot bring its own suit except through the Justice Department and must rely on adventitious suits of private plaintiffs to maintain competitive conditions.

The Court is persuaded that the harm plaintiff would suffer if the merger is not enjoined far outweighs the harm defendants may suffer as a result of an injunction. The result of this balancing, coupled with the finding of strong likelihood that plaintiff will succeed on the merits, leads to the conclusion that this merger must be enjoined.

## III. CONCLUSION

The overwhelming statistical evidence has demonstrated a strong probability that the proposed merger will substantially lessen competition in violation of Section 7 of the Clayton Act. This showing has not been rebutted by clear evidence that the proposed merger will not, in fact, substantially lessen competition. Defendants have failed to demonstrate ease of entry into the retail grocery industry. This Court finds that unless defendants are enjoined, the citizens of California will be substantially and irreparably harmed. While the Court in no way belittles the harm defendants may suffer as a result of this preliminary injunction, the Court concludes that it is substantially less than the harm plaintiff would suffer if the merger is not enjoined.

## ORDER

That defendants American Stores Company, Alpha Beta Acquisition Corporation, and Lucky Stores, Inc., and their respective successors and assigns, officers, directors, agents, subsidiaries, divisions, groups, affiliates, representatives, employees and attorneys, and all persons acting in concert or participation with them, shall, in accordance with Federal Rule of Civil Procedure 65, during the pendency of this action, be

enjoined, restrained and ordered, pursuant to 15 U.S.C. § 26, as follows:

1. Take all steps necessary to operate American Stores Company, Alpha Beta Acquisition Corporation and their subsidiaries, divisions and groups (collectively "American Stores"), independently of the assets and businesses of Lucky Stores, Inc. ("Lucky") in the State of California.

2. Refrain from taking any action to modify the status quo as to the California operations of Alpha Beta or Lucky as of September 6, 1988, other than in the ordinary course of business, and shall refrain from taking any further steps to merge or integrate the assets and businesses of American Stores' Alpha Beta California operations with those of Lucky's California operations or any further steps to merge or integrate the assets and businesses of Lucky's California operations with those of American Stores' Alpha Beta California operations.

IT IS SO ORDERED.